# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 13, 2011

No. 10-10325

Lyle W. Cayce
Clerk

SAMANTHA SANCHES,

Plaintiff-Appellant,

versus

CARROLLTON-FARMERS BRANCH
INDEPENDENT SCHOOL DISTRICT,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Texas

Before SMITH, DeMOSS, and OWEN, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Samantha Sanches appeals summary judgment on her claims of sex dis-crimination and retaliation under 20 U.S.C. § 1681(a) ("title IX") and 42 U.S.C. § 1983. Reduced to its essentials, this is nothing more than a dispute, fueled by a disgruntled cheerleader mom, over whether her daughter should have made the squad. It is a petty squabble, masquerading as a civil rights matter, that has no place in federal court or any other court. We find no error and affirm.

No. 10-10325

I.

Sanches was a student, and sometimes a cheerleader, at Creekview High School ("Creekview"), in the Carrollton-Farmers Branch Independent School District, from 2005 to 2009. She alleges that during the spring of her junior year in 2008, she was sexually harassed by J.H., who was a Creekview senior and female cheerleader.

J.H. and Sanches's problems began in March 2008, when J.H. was suspended from cheerleading for one week for posting inappropriate Facebook photos. J.H. believed that Sanches's mother, Liz Laningham, had turned over the photos to Creekview administrators, so J.H. threatened to get back at Sanches. On March 12, Laningham warned Cyndi Boyd, Creekview's principal, about J.H.'s comments. Boyd directed Lisa Leadabrand, an assistant principal, to set up a conference with J.H. and her mother to discuss J.H.'s actions.

The same day that Laningham emailed Boyd and Leadabrand about J.H.'s threats, Laningham sent three additional emails—two of which are germane[1]—describing what she characterized as violations of Sanches's rights. The first email accused another senior cheerleader, K.O., of hazing because K.O. had read a letter to the cheer class that discussed her frustration with the team and some of the cheerleaders' parents.[2] Laningham thought the letter was directed at Sanches and her. The second email accused three senior cheerleaders—K.O., M.W., and J.H.—of hazing because they announced that they would make the 2008-09

---

[1] The third email accused the junior varsity cheer coach, Tim McAtee, of shoving Sanches onto the court before the start of a basketball game where Sanches was cheering. McAtee told the administration that Sanches and another cheerleader were late because they were talking to some boys during the National Anthem, so he grabbed them by the arm and told them to get out onto the court.

[2] Boyd spoke with McAtee, the coach in charge of Sanches's cheerleading class, and notified him that she was considering removing him as a cheerleading coach for the following year because he had allowed K.O. to read the letter.

2

cheerleader tryouts "as hard as possible so the juniors won't make it."[3]  The seniors' plan was not, however, a response to the March Facebook incident:  Laningham complained as early as February that the seniors were "going to make the dance extremely hard so the current juniors won't make it."[4]

On March 26, J.H. saw Sanches walking down the hall with J.H.'s ex-boyfriend, C.P., and discovered that Sanches had been dating C.P. since spring break.[5]  J.H. was upset, and as she walked into the sixth period class she shared with Sanches, J.H. said loudly to her friends that she was in the presence of a "ho" and "would beat her ass if it weren't for cheerleading."  Sanches knew that J.H. was referring to her, and Sanches left sixth period class to call her mother. Laningham immediately contacted the administration, and within two hours Leadabrand assured Laningham that she was investigating the incident. Leadabrand interviewed and took statements from J.H., Sanches, two students who overheard the comments, and the sixth-period teacher.  They gave conflicting accounts about what was said, but all agreed that there was visible tension between J.H. and Sanches.  Leadabrand switched J.H. to a different sixth period class within five days.

Laningham was worried that the senior girls would try to disadvantage her daughter in the upcoming cheerleader tryouts on April 18; she was upset at what she believed to be the administration's preferential treatment of the senior cheerleaders over Sanches.  As a result, Laningham's lawyer wrote a six-page letter to the superintendent, Annette Griffin, complaining of a range of activity: Laningham's belief that Creekview favored J.H., K.O., and M.W. over Sanches;

---

[3] The senior cheerleaders choreograph the tryout routine each year.

[4] Laningham then suggested many ways in which Creekview could change the tryout process.

[5] C.P. and J.H. dated for three years and broke up at the beginning of their senior year.

No. 10-10325

problems with the booster club; Laningham's conflict with the administration over the end-of-year video; and other alleged wrongs.[6]

_____

[6] Laningham has a long history of complaining about Creekview's cheerleading program in general and Sanches's treatment in particular. The following is a non-exhaustive list of Laningham's actions in this regard:

● Oct. 2005: Asked for the freshman squad captain to be removed from her position as captain because she kissed Sanches's then-boyfriend and told Sanches about it.

● Aug. 2006-Jan. 2007: Complained about the booster club's gifts to Coach Westby (the booster club threw her a baby shower), alleging that the gifts were in violation of state interscholastic rules. She also complained about the booster club's methods of amending the bylaws. The booster club voluntarily dissolved in the spring of 2007 because of Laningham's complaints.

● May 2007: Asked Boyd to switch Sanches out of her cheerleading stunt group because she believed it was unsafe. The cheerleading coach informed Boyd that the stunt group was, in her professional opinion, perfectly safe.

● Sept. 2007: Complained that the end-of-year banquet was scheduled at a time that did not work for three cheerleaders, including Sanches, and argued that the seniors should not be allowed to dictate a date that was not convenient for the entire team.

● Oct. 2007: Complained about the way the squad chose who would be doing jump sequences at homecoming.

● Jan. 2008: Laningham and her husband, Sanches's stepfather, wrote several emails demanding to know which cheerleaders' parents did not want Laningham compiling the end-of-year video. The administration finally caved and allowed Laningham to produce the video. After completing it, she did not return pictures submitted by other parents until their lawyer threatened suit.

● Feb. 2008: Emailed Creekview's athletic director, Renee Putter, regarding what Laningham believed to be infractions of the Cheerleader Constitution by senior cheerleaders J.H., K.O., and M.W. She described sixteen separate infractions and noted the demerits that she believed each called for. Laningham complained about the favoritism she believed the coaches and administration showed toward those cheerleaders, because they had not been punished. She requested that J.H. be removed from the squad and that K.O. and M.W. be benched for three weeks.

● Mar. 2008: Complained that McAtee had "publicly humiliated and degraded Sami and the juniors twice at banquet" and that J.H. had "publicly humiliated Samantha and our family at banquet." Apparently, by leaving "the juniors out on multiple occasions in several speeches" at the banquet, McAtee had left "the juniors humiliated and in tears." According to Laningham, J.H. publicly humiliated Sanches and her family by wearing a chef's hat similar to the

(continued...)

No. 10-10325

In her letter, Laningham spent two sentences discussing the "ho" incident but consumed four paragraphs complaining about the booster club's dissolution and a full page discussing her affront at being asked to turn over production of the end-of-year video to others.  Laningham asked for the following relief: (1) that the current junior cheerleaders, including Sanches, be permitted to skip tryouts and automatically be placed on the varsity squad; (2) that Boyd, Leadabrand, and McAtee "be held accountable for their actions and inaction"; and (3) legal costs. Laningham did not ask for any remedy for harassment, nor did she describe the "ho" incident as sexual harassment.

The school district responded to Laningham's letter on April 17, the day before tryouts, through its attorney.  The letter noted that "[t]he District takes all such allegations seriously, and, with advice and assistance from this firm, intends in due course to fully and thoroughly review such matters and the requested categories of relief."  Preliminarily, however, it notified Laningham that the tryouts would proceed as scheduled.  The district believed that the process was fair and impartial: Unbiased judges unaffiliated with Creekview scored the participants, and even if the routine was excessively difficult, it was equally difficult for all the girls.

Before the district sent that response, however, Creekview made changes to the cheerleader tryouts of its own accord.  The week of April 14-18 consisted of a clinic at which the students who wanted to try out for the squad learned the routines and practiced with the guidance of the seniors and coaches.  On Monday night, after the first night of the clinic, J.H., K.O., and M.W. drove by Sanches's house intending to run up to the front door, ring the doorbell, and run away.  But as the girls sat in their car parked outside the house, Laningham saw the girls and chased them away.

---

[6] (...continued)
one in her inappropriate Facebook photos.

The girls voluntarily told Leadabrand what they had done, and Leadabrand in turn reported their actions to Boyd. After investigating the incident further, Boyd notified the girls and their parents on Wednesday, April 16, that they would not be allowed to participate in the clinic for the rest of the week. Boyd explained that such action was necessary "to protect the cheer process, make it equitable to all, and remove any possible threat of perceived intimidation." In response to that punishment, nine of the ten varsity cheerleaders quit the team.

Ultimately, Sanches did not make the varsity squad. She argues that her scores were suspiciously lower than prior years' tryouts, but she has not pointed to any evidence that the outside judges were partial in any way. There is also no evidence that any senior cheerleader was present during tryouts.

Sanches was allegedly devastated by not making the squad. It was at that point that Laningham began to escalate her complaints against J.H. On April 23, Laningham sent three emails to Boyd complaining of sexual harassment against Sanches. She claimed (1) that on April 11, J.H. had overheard Sanches in the locker room discussing a rash on Sanches's breast, then J.H. started a rumor that Sanches "had a hickey on her boob"; (2) that on April 15, J.H. "cornered" Sanches in the hallway during a passing period, "told [her] that she [J.H.] was having sex with [C.P.]," and "physically touched her by wiping the tears from [Sanches's] eyes"; and (3) that on April 22, J.H. slapped C.P.'s buttock as she walked by Sanches and C.P. and stated that "your ass is so cute and you and [Sanches] are so cute!" Laningham made sure to point out in her emails that the first incident occurred on "the last school day prior to tryout week," the second on "the second day of tryout week."

Boyd investigated all three incidents and took statements from the parties involved. She discovered that J.H. was not in the locker room when Sanches discussed the mark on her breast, so J.H. could not have overheard Sanches. J.H.

also completely denied the allegation. Further, Sanches was the one who began openly discussing the rash in front of many girls. Regarding the hallway incident, J.H. admitted to talking to Sanches and wiping away her tears but said she was doing so to comfort Sanches because she understood that C.P. was "playing" both of them. Regarding the butt-slap incident, J.H. again admitted to her actions, but C.P. did not find the slap offensive, so no action was taken.

On April 29, while Creekview was investigating Laningham's three complaints, J.H.'s parents wrote Boyd a letter describing their "formal complaint for harassment of [their] daughter" by Laningham and Sanches for bringing unsubstantiated and frivolous complaints against J.H. They stated that the administration was unfairly "allow[ing] one parent to drive an entire program and influence decision making," and they believed that removing J.H. from the tryout process was unreasonable. Further, they noted that J.H. was taking anti-anxiety medication because of Laningham's actions and because of false rumors in the student body that J.H. had vandalized the Laninghams' home. They requested that the administration uphold its "obligation to protect all students" equally.

After completing the investigation, Creekview decided not to take further action against Sanches or J.H. The administration was receiving conflicting reports about the incidents from both girls and their parents, and by that point in the school year, J.H. had quit cheerleading and thus was no longer in any of Sanches's classes or extracurricular activities.

Unhappy that their daughter had not made the varsity squad, Sanches's parents filed a grievance with the district on May 1 for "failure to provide an equal opportunity tryout for Varsity Cheer" and "failure to ensure that all candidates were eligible to tryout." The Laninghams mentioned the hickey incident and the hallway incident in which J.H. wiped Sanches's tears, but only in the context of alleging that those incidents created sufficient stress on Sanches that she was at an unfair disadvantage for tryouts. The remainder of the ten-page

7

grievance discussed other complaints the Laninghams had with the fairness of Creekview's tryouts. The "only" relief they sought was for the district to place Sanches on the varsity cheer squad immediately.

On May 9, J.H.'s mother emailed Boyd, Leadabrand, and another assistant principal, Phyllis Reed, to complain that Sanches had harassed J.H. The mother accused Sanches of besmirching J.H.'s reputation by telling another student in her sixth period that J.H. was pregnant with C.P.'s baby. Reed took statements from two students in that class on May 12, and Leadabrand took Sanches's statement on May 14. The same day that Leadabrand spoke to Sanches, Laningham emailed Boyd to report that it was J.H. who had allegedly harassed Sanches by spreading the same pregnancy rumor. Laningham asserted that J.H. had started the rumor to upset Sanches, but J.H. adamantly denied that allegation, and there is no evidence in the record to support Laningham's conclusional accusations based on hearsay.

At some point in May, the district informed Laningham that it would not place Sanches on the cheerleading squad. On June 4, Laningham appealed that decision, noting that in the first grievance procedure, the overseeing administrator had characterized the alleged harm as "that [Sanches] did not make varsity cheer." Laningham stressed that in addition to that harm, she was alleging that Sanches

> suffered irreparable harm from April 11-18 at the hands of Creekview cheerleaders, Creekview students, Creekview teachers, Creekview administrators and CFBISD administrators, which included acts of trespassing, hazing, harassment, sexual harassment, mental abuse, deliberate neglect, and failure of school officials to act upon these transgressions resulting in the infliction of undue emotional distress and mental anguish upon our daughter and a tainted and unfair cheerleader tryout.

Despite what appear to be very serious allegations, Laningham's requested relief did not address the alleged student-on-student harassment in any way oth-

er than asking that "each coach, teacher and administrator who failed in their duties . . . be held accountable by the District." In addition, Laningham asked that Sanches be placed on the varsity squad, that all cheerleader activities for the upcoming year be done anew (including "the selection of big sis/lil sis cheer families"), that the district reimburse the Laninghams for their legal fees, and that the district and Creekview read an apology to the Laninghams in front of the cheerleading organization.

The district denied Laningham's appeal, but Laningham appealed that denial on July 4 to the district's board of trustees. In her final grievance filing, Laningham made a larger issue of the alleged harassment than in her past filings. In the last paragraph, she asserted that the district had been indifferent to the "emotional distress and mental anguish our daughter continues to suffer" and reasserted her concern that Sanches was not "provided a fair and equitable tryout." The Board denied Laningham's final appeal.

On August 14, Boyd sent Laningham a formal report outlining Creekview's investigations of and responses to five of Laningham's allegations of harassment: the "ho" incident, the hickey incident, the hallway incident, the butt-slap incident, and the pregnancy rumor.[7] Boyd's findings, in addition to noting that J.H. had already graduated, are summarized as follows:

● The "ho" incident: There was apparent tension between Sanches and J.H., so J.H. was removed from Sanches's sixth-period class;

● The hickey incident: There was no evidence that J.H. had spread the rumor, and Sanches had openly discussed the mark on her breast in the locker room in front of many girls;

● The hallway incident: Sanches and J.H. stated that J.H. was only trying

---

[7] Boyd noted that Laningham had voiced many other complaints in the preceding months, but those actions were not addressed in the report, because they were not covered by the district policy pertaining to discrimination, harassment, and retaliation.

No. 10-10325

to comfort a visibly upset Sanches, so no harassment had occurred;

● The butt-slap incident: The school reviewed a video recording of the incident and, after speaking with C.P., Sanches, and J.H., determined that no harassment had occurred, yet still verbally warned J.H.;

● The pregnancy rumor: Boyd did not believe that the rumor constituted sexual harassment, and because of the conflicting allegations of J.H. and Sanches, and the fact that Sanches had admitted to spreading the rumor as well, the school did not punish anyone.

Over the summer, Sanches began seeing a psychiatrist, who diagnosed her with depression and prescribed medication. Sanches claims that she did not want to go back to school and took a course over the summer so she could graduate a semester early. Her grades fell from a 3.0 average her sophomore year to 2.71 her junior year, then rose to 2.86 her senior year.[8] She did not want to participate in senior activities, cried often, and had passive suicidal thoughts (although she admitted that she never tried and never would try to kill herself). In her brief and affidavit, Sanches claims that the alleged harassment caused her emotional distress, but when asked during her deposition to describe instances at school when she became emotional, she described breakdowns that resulted from not having made the cheerleading squad.

## II.

Sanches sued the district in September 2008, claiming it had violated title IX because it had been deliberately indifferent to her alleged harassment. She also claimed, under § 1983, that the district had violated the Equal Protection Clause by engaging in a policy or practice that caused others to harass her sexually. Finally, she claimed that the district retaliated against her in violation of

---

[8] Sanches also argues that she was denied admission to Texas Tech University, her top choice, because she did not have a B (3.0) average.

title IX and § 1983 for complaining about the harassment.

The magistrate judge, to whom this matter was referred by consent, granted the district summary judgment on only the harassment claims under title IX and § 1983 but issued an amended opinion and order that also granted the district summary judgment on both retaliation claims. Sanches filed a motion with a district judge to vacate the magistrate judge's opinion and order, but the district judge denied it. Sanches appeals summary judgment on all four claims and the district judge's decision not to vacate the magistrate judge's ruling.

## III.

"We review [a] summary judgment de novo." *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 435 (5th Cir. 2011). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The movant has the burden of showing that summary judgment is appropriate, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and we view the evidence in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Once the moving party has carried its burden, the non-movant must come forward with specific facts showing a genuine factual issue for trial. *Id.* Conclusional allegations and denials, speculation, and unsupported assertions are insufficient to avoid summary judgment. *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

### A.  Title IX.

Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal finan-

No. 10-10325

cial assistance." 20 U.S.C. § 1681(a). A school district that receives federal funds may be liable for student-on-student harassment if the district (1) had actual knowledge of the harassment, (2) the harasser was under the district's control, (3) the harassment was based on the victim's sex, (4) the harassment was "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit," and (5) the district was deliberately indifferent to the harassment. *See Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). As a matter of law, J.H.'s conduct was not sexual harassment, it was not severe, pervasive, or objectively unreasonable, and the school district was not deliberately indifferent.

1.

Same-sex sexual harassment is actionable under title IX. *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998). The offensive behavior, however, must still be based on sex, per the words of title IX, and "not merely tinged with offensive sexual connotations." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002). Sanches cites only two cases to support her claim that J.H.'s calling Sanches a "ho" was based on her sex. In the first, *Doe v. East Haven Board of Education*, 200 F. App'x 46 (2d Cir. 2006), a girl who was raped off-campus endured daily verbal harassment for five weeks following the rape, including being called a "slut," "liar," "bitch," and "whore." In the second case, *Riccio v. New Haven Board of Education*, 467 F. Supp. 2d 219 (D. Conn. 2006), the victim was called a variety of pejorative epithets daily, including "bitch," "dyke," and "freak," taunted as the "lesbian lover" of another female student, and threatened with physical harm constantly. J.H. referred to Sanches only once as a "ho" and did not even make the comment to her directly. That is hardly comparable to the harassment suffered by the students in *Frazier* and *East Haven*, and it by no means qualifies as harassment at all.

12

No. 10-10325

Nor does the rest of J.H.'s conduct appear to be based on Sanches's sex, and Sanches does not cite a single case for support. J.H. was upset with Sanches because Sanches was dating J.H.'s ex-boyfriend and because J.H. believed Laningham had gotten her in trouble with the school. There is nothing in the record to suggest that J.H. was motivated by anything other than personal animus. Her conduct—slapping C.P.'s buttock and perhaps starting rumors that she was pregnant and that Sanches had a hickey on her breast—is more properly described as teasing or bullying than as sexual harassment. Because harassment "on the basis of sex is the sine qua non of a Title IX sexual harassment case, and a failure to plead that element is fatal," *Frazier*, 276 F.3d at 66, the district is entitled to summary judgment on the title IX claim.

2.

Even if J.H.'s alleged harassment was based on sex, it was not severe, pervasive, or objectively unreasonable. Sanches cites several cases and argues that the alleged harassment she suffered was just as severe as or worse than what those victims endured. All of those cases, however, involve conduct much more severe, pervasive, or objectively unreasonable than what Sanches claims she was subjected to.

First, she cites *Hayut v. State University of New York*, 352 F.3d 733 (2d Cir. 2003), in which during every biweekly class, for the entire semester, a male professor called a female student "Monica" because he thought she looked like Monica Lewinsky. When the student spoke to other students during class, the professor said, "Be quiet, Monica. I will give you a cigar later." *Id.* at 739. At the first class after almost every weekend, the professor would ask her, "How was your weekend with Bill?" *Id.* The professor also made negative comments about women's proper social status and exhibited a general hostility toward females. *Id.* at 748. In *Hayut*, the victim and harasser were a student and profes-

13

sor—a much more formal relationship that "necessarily affects the extent to which the misconduct can be said to breach" title IX. *See Davis*, 526 U.S. at 653. Peer harassment is less likely to support liability than is teacher-student harassment. *Id.*

Next, Sanches cites *East Haven*, which, as discussed above, involved the daily mocking, for five weeks, of a student who had been raped. Being constantly called a "liar" and a "slut" after having been raped is undoubtedly more severe than being called a "ho" once for nabbing one's friend's ex-boyfriend.

Third, Sanches relies on *Roe ex rel. Callahan v. Gustine Unified School District*, 678 F. Supp. 2d 1008 (E.D. Cal. 2009), in which a ninth-grade boy was physically, sexually, and verbally assaulted at football camp. The upperclassmen held him down, shoved an air pump up his rectum, and turned it on. He was sexually assaulted in the shower and hit in the head with a pillowcase filled with heavy objects. One boy even smacked the victim across the face with his penis. J.H.'s wiping Sanches's tears off her face in a facetious manner and slapping C.P.'s buttock while Sanches held his hand is much less offensive than the abuse the victim in *Roe* suffered. Sanches's description of that victim as having been "rough-housed and exposed during football practice and called a 'fag' and a 'homo'" is a profound mischaracterization and understatement of the sexual harassment that boy suffered.

Finally, Sanches cites *Doe ex rel. Pahssen v. Merrill Community School District*, 610 F. Supp. 2d 789, 808-09 (E.D. Mich. 2009), in which a boy threw a girl against her locker, told her he wanted her to perform oral sex on him, made sexual gestures toward her, and ultimately raped her. The court did not consider the rape in determining the harm that resulted from the district's inactions, but it did consider the rape in determining the severity of the harassment.[9] Even

---

[9] As soon as the district learned of the rape, it expelled the boy, and thus, as the plain-
(continued...)

No. 10-10325

though Sanches claims that she "is not arguing that her experience at the District compares with cases of sexual assault," she goes on to say that "her junior year was a nightmare of gender-based bullying and harassment." She asserts that "[a]nalogies will never be perfect, but the case law is illustrative." But the caselaw she refers to illustrates only that the conduct she alleges is nothing like what was perpetrated against the plaintiffs in the cases cited.

In addition to the fact that Sanches has not cited any precedent that supports her arguments, looking at J.H.'s conduct against the Supreme Court's strenuous standard leaves little doubt that the treatment of Sanches—even if it was harassment at all—was not severe, pervasive, or objectively unreasonable. Whether conduct rises to the level of actionable harassment "depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Davis*, 526 U.S. at 651 (internal citations and quotation marks omitted).

In distinguishing actionable harassment under title VII from that under title IX, the *Davis* Court explained that courts "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Id.* "[E]arly on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Id.* at 651-52. Thus, to be actionable, the harassment must be more than the sort of teasing and bullying that generally takes place in schools; it must be "severe, pervasive, and objectively unreasonable." *Id.* at 652.

---

[9] (...continued)
tiffs appeared to concede, the district's response to the rape was not deliberately indifferent and so could not form the basis for liability. *Merrill*, 610 F. Supp. 2d at 809.

15

No. 10-10325

The Court further warned, in response to the concern that a school might be liable for *any* negative student interactions, that courts should not be "mis-lead . . . to impose more sweeping liability than" what title IX requires. *Id.*

Were we to find that Sanches's alleged harassment was severe, pervasive, and objectively unreasonable, no conduct would be beyond the reach of title IX. Dating and relationships are an inescapable part of high school, as is the resulting stress. It is a trying time for young people, who experience a wide range of emotions and often lack the skills to control them. J.H. was acting like a typical high-school girl whose ex-boyfriend began dating a younger cheerlead-er. That is the sort of unpleasant conflict that takes place every day in high schools, and it is not the proper stuff of a federal harassment claim.

It makes no difference to our analysis that Sanches was sincerely upset, and we assume that she was. The standard is not subjective; instead it is wheth-er the harassment was severe, pervasive, and *objectively* unreasonable. J.H.'s conduct may have been inappropriate and immature and may have hurt San-ches's feelings and embarrassed her, but it was not severe, pervasive, and objec-tively unreasonable. Summary judgment is appropriate.

3.

The school district was not deliberately indifferent to the alleged harass-ment. For a school to be liable under title IX, its response, or lack thereof, to the harassment must be "clearly unreasonable in light of the known circumstances." *Id.* at 648. That is a high bar, and neither negligence nor mere unreasonable-ness is enough. *Id.* at 642, 648. Schools are not required to remedy the harass-ment or accede to a parent's remedial demands, *id.* at 648, and "courts should refrain from second-guessing the disciplinary decisions made by school admin-istrators," *id.* "[T]here is no reason why courts, on a motion . . . for summary judgment . . . could not identify a response as not 'clearly unreasonable' as a

No. 10-10325

matter of law." *Id.* at 649.

Sanches has put forth two arguments why the school's response was clearly unreasonable: first, that the administration conducted sham investigations that did not remedy the harassment; and second, that Creekview did not follow the district's procedures for reporting sexual harassment, thus making any action Creekview took clearly unreasonable. Neither argument is convincing.

a.

Sanches asserts that school officials unfairly dismissed her allegations without investigating the incidents. She acknowledges that Creekview took statements after each reported event, spoke to J.H. about her conduct, and removed J.H. from her sixth-period class and cheerleading tryouts, but that those responses were ineffective, so the school's investigations were shams.

Ineffective responses, however, are not necessarily clearly unreasonable. In *Doe ex rel. Doe v. Dallas Independent School District*, 220 F.3d 380 (5th Cir. 2000), a student reported that a teacher had sexually assaulted him. The principal interviewed the student, the student's mother, and the teacher. The principal concluded, erroneously, that the assault had not taken place, yet warned the teacher "that he would be 'dealt with' if the accusations were founded [and] that he should avoid acting in a way that could be misconstrued." *Id.* at 388. The teacher had actually molested several boys and was ultimately convicted of sexual assault and indecency with a child. We stated that as tragic as the consequences were, the principal's actions, although ineffective, were not clearly unreasonable. *Id.*

Similarly, the district's responses here were not clearly unreasonable merely because the actions continued or because Laningham was unhappy that the district did not remove J.H. from cheerleading or force-place Sanches onto the squad. Each time Laningham lodged a complaint, a school official took state-

17

ments from the students, who often gave conflicting accounts. After the "ho" incident, J.H. was immediately transferred out of Sanches's class. That the school left them together in their fourth-period cheerleading class is not clearly unreasonable. Considering J.H.'s actions up until that point, we will not second-guess the school's belief that minimizing the number of interactions between the girls might alleviate their tension and that removing one of them from the squad was itself an unreasonable step in light of the circumstances.

It was only after Sanches failed to make the squad that Laningham began her barrage of accusations against J.H. It is true that the hickey, hallway, and butt-slap incidents occurred during tryout week and may have caused Sanches stress, but Creekview was not notified of those occurrences until after tryouts were over. By that point, Boyd's banning of the senior cheerleaders from tryouts had induced all the senior girls, except one, to quit, so Sanches no longer had any classes or extracurricular activities with J.H. Creekview's investigations of those three incidents led to conflicting statements from the girls, and so it determined that no further action was warranted considering the non-severity of the allegations and the lack of interaction between the girls by that time.

Laningham demanded, because of what she believed to be the impartiality of tryouts and the undue stress that Sanches suffered, that the school immediately force-place Sanches on the varsity squad. Officials at Creekview and the district investigated her concern, and all reached the same conclusion: There was no evidence that other girls received preferential treatment during tryouts; the difficult routine did not place Sanches at an unfair disadvantage; and impartial judges had scored the girls. We emphatically decline to say that the district's decision not to place Sanches on the cheerleading squad—the very source of her troubles—constitutes deliberate indifference to any harassment.

The district's actions also stand in sharp contrast to those in other cases

18

No. 10-10325

in which school officials were deliberately indifferent.[10]  J.H. threatened to "get back" at Sanches for turning in the Facebook photos, so the school held a conference with J.H. and her mother to address the threats.  J.H. called Sanches a "ho," so the school transferred her out of that class.  J.H. may have started the hickey rumor, wiped away Sanches's tears in a facetious manner, and slapped C.P.'s buttock as he walked down the hall with Sanches, but by then J.H. had already been banned from cheerleading tryouts and had quit the squad.  The last incident—the pregnancy rumor—was actually first reported by J.H.'s mother in an effort to stop Sanches from spreading the story.  That the district's response was to take no further action, when both girls claimed they did not want the rumor spread any further, is not clearly unreasonable.

b.

Sanches claims the district was deliberately indifferent because it failed to follow its own procedures regarding sexual-harassment complaints.  Sanches states that the harassment policy directs a principal to contact the district's title IX coordinator or the superintendent immediately following any allegation of harassment, and Boyd's failure to do so is evidence of deliberate indifference.

But just because Boyd allegedly failed to follow district policy does not mean that her actions were clearly unreasonable.  A district's "failure to comply with [its] regulations . . . does not establish the requisite . . . deliberate indifference." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291-92 (1998).  In

---

[10] *See Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248 (11th Cir. 2010) (in which a teacher sexually assaulted several students, many students reported the assaults, but the teacher was suspended for only a short time, then was allowed to resume teaching); *Patterson v. Hudson Area Schs.*, 551 F.3d 438 (6th Cir. 2009) (in which the sexual assaults of a student increased in severity over a period of five years, but the school took no action to deter the harassers and tried to separate the victim using an alternative teaching method that it knew did not work); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000) (in which a student was physically and sexually assaulted, and the school did not conduct any investigations or discipline any students).

*Gebser*, the Court noted that it has never held "that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements." *Id.* at 292.

Even if Boyd had reported the conduct to the title IX coordinator or the superintendent, Creekview's administrators took precisely the action that the policy required.[11] In *Rost ex rel. K.C. v. Steamboat Springs RE-2 School District*, 511 F.3d 1114 (10th Cir. 2008), a district failed to follow its own policy that an administrator should interview the alleged offender and victim to determine whether the harassment had occurred. Instead, the administrator relied on law enforcement's investigations of the incident. "Perhaps the district should have independently interviewed the boys involved instead of relying on Officer Patrick's investigation and periodic reports, but such an allegation would sound in negligence, not deliberate indifference." *Id.* at 1122. Title IX does not require flawless investigations or perfect solutions. *Id.* (citing *Fitzgerald v. Barnstable Sch. Comm.*, 129 S. Ct. 788 (2009)).

If Boyd had notified the title IX coordinator or superintendent of Laningham's complaints, they would have directed her, according to district policy, to conduct interviews and weigh the merits of the allegations, which is precisely what Boyd did. Her failure immediately to report Laningham's numerous complaints is therefore not clearly unreasonable, so the district was not deliberately indifferent to Sanches's alleged harassment. Because the supposed harassment was not based on sex, it was not severe, pervasive, or objectively unreasonable,

---

[11] The policy states: "Upon receipt or notification of a report, the District official shall determine whether the allegations, if proven, would constitute sexual harassment or other prohibited harassment as defined by District policy. If so, the District official shall immediately authorize or undertake an investigation. . . . The investigation may be conducted by the District official or a designee, such as the campus principal . . . . The investigation may consist of personal interviews with the person making the report, the person against whom the report is filed, and others with knowledge of the circumstances surrounding the allegations. The investigation may also include analysis of other information or documents related to the allegations."

No. 10-10325

and the district was not deliberately indifferent to it, we affirm summary judgment on the title IX claim.

## B. Title IX Retaliation.

Sanches claims that she received no notice that the magistrate judge would be addressing her title IX retaliation claim, so there was a violation of the ten-day notice requirement of Federal Rule of Civil Procedure 56. That is incorrect. Although the district did not explicitly state in its initial brief that it sought summary judgment as to both Sanches's title IX harassment and retaliation claims, it did clarify its motion to seek summary judgment for both in its reply brief. The magistrate judge did not mention Sanches's title IX claim in his initial order of summary judgment, but that does not negate the fact that the district's reply brief put Sanches on notice.

Sanches's substantive argument regarding the retaliation claim is also unconvincing. To establish title IX retaliation, Sanches must show that the district or its representatives took an adverse action against her because she complained of harassment. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005). Sanches asserts that Leadabrand "joined forces" with J.H. "while posing as the one 'investigating' Sanches's complaints." Sanches argues that Leadabrand's behavior empowered J.H. and gave her "free reign to sexually harass, intimidate, and try to mentally destroy Sanches, to teach Sanches a lesson for reporting sexual harassment."

Those conclusional statement are not supported by the record: J.H. was removed from Sanches's class, Leadabrand reported J.H. to Boyd after the drive-by incident that led to J.H.'s ban from the clinic, and by the time the administration had heard about the hickey, hallway, and butt-slap incidents, J.H. had already quit cheerleading. There is no support in the record for Sanches's flimsy arguments, so we affirm summary judgment on her title IX retaliation claim.

21

No. 10-10325

C.  Section 1983 Claim.

To state a claim under § 1983 for a violation of the Equal Protection Clause, Sanches must show that her sexual harassment was the result of a policy or practice of the district. *Fitzgerald*, 129 S. Ct. at 797.  Sanches argues that the harassment of her was caused by the district's "practice of deliberate indifference to allegations of harassment." As discussed above, however, (1) any harassment was not based on her sex, so there is no constitutional violation; and (2) there is no evidence that the district was ever deliberately indifferent, so we affirm summary judgment for the district.

D.  Section 1983 Retaliation Claim.

To overcome summary judgment on her § 1983 retaliation claim, Sanches must present some evidence that the district retaliated against her because she complained of sex discrimination. *Cf. Jackson*, 544 U.S. at 184 (stating the standard in the similar title IX context).  Sanches asserts that the district did so by "sponsoring students reading defamatory letters in class relating to Sanches," departing from district policy regarding sexual harassment complaints, and "creating blockades and consistent difficulties for Sanches."

Those assertions, however, are unsupported by the record.  First, after Laningham informed Boyd of the letter that K.O. had read to the cheerleading class, Boyd reprimanded McAtee and told him she was even considering removing him from his coaching position for the following year.  Second, as mentioned above, Boyd's failure to notify the title IX administrator was not clearly unreasonable.  And finally, the "blockades and consistent difficulties" that Sanches refers to are the district's multiple denials, through the grievance process, to reinstate her on the cheerleading squad, because it believed that there was no evidence that the tryouts had been conducted unfairly.  Because Sanches has failed to point to any evidence that the district retaliated against her, we affirm sum-

22

No. 10-10325

mary judgment on this claim.

IV.

This matter was referred for final decision to Magistrate Judge Paul Stickney by mutual consent of the parties pursuant to 28 U.S.C. § 636(c). After Judge Stickney had issued his amended opinion and order, Sanches filed a motion with the district court to vacate the summary judgment under 28 U.S.C. § 636(c)(4), which provides that a district "court may, for good cause shown on its own motion, or under extraordinary circumstances shown by any party, vacate a reference of a civil matter to a magistrate under this subsection." The district court denied the motion, and Sanches appeals.

We review denials of motions to vacate under § 636(c)(4) for abuse of discretion. *See Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 292 (5th Cir. 2002). Sanches argues that extraordinary circumstances exist because Judge Stickney applied improper legal standards and dismissed her § 1983 claims without analysis or review. She cites only one case in support, but it is completely irrelevant.[12] All parties gave consent here, and the district court applied the correct legal standard on all issues. Dissatisfaction with a magistrate judge's decision does not constitute "extraordinary circumstances."

Not content to raise this issue of law in a professional manner, Sanches and her attorneys launched an unjustified attack on Magistrate Judge Stickney. The main portion of the argument on this point, contained in Sanches's opening brief, reads *verbatim* as follows:

> The Magistrate's egregious errors in its [*sic*] failure to utilize or apply the law constitute extraordinary circumstances, justifying vacateur [*sic*] of the assignment to [*sic*] Magistrate. Specifically, the

---

[12] *See Murrett v. City of Kenner*, 894 F.2d 693, 694-95 (5th Cir. 1990) (upholding a district court's decision to vacate a jury trial conducted by a magistrate because not all parties had consented to the referral).

No. 10-10325

> Magistrate applied improper legal standards in deciding the Title IX elements of loss of educational opportunities and deliberate indifference, ignoring precedent. Further, the Court failed to consider Sanches' Section 1983 claims and summarily dismissed them without analysis or review. Because a magistrate is not an Article III judge, his incompetence in applying general principals [*sic*] of law are [*sic*] extraordinary.

(Footnote omitted.)

These sentences are so poorly written that it is difficult to decipher what the attorneys mean, but any plausible reading is troubling, and the quoted passage is an unjustified and most unprofessional and disrespectful attack on the judicial process in general and the magistrate judge assignment here in particular. This may be a suggestion that Magistrate Judge Stickney is incompetent. It might be an assertion that all federal magistrate judges are incompetent. It could be an allegation that only Article III judges are competent. Or it may only mean that Magistrate Judge Stickney's decisions in this case are incompetent, a proposition that is absurd in light of the correctness of his impressive rulings. Under any of these possible readings, the attorneys' attack on Magistrate Judge Stickney's decisionmaking is reprehensible.[13]

The summary judgment on all of Sanches's claims is AFFIRMED.

---

[13] Usually we do not comment on technical and grammatical errors, because anyone can make such an occasional mistake, but here the miscues are so egregious and obvious that an average fourth grader would have avoided most of them. For example, the word "principals" should have been "principles." The word "vacatur" is misspelled. The subject and verb are not in agreement in one of the sentences, which has a singular subject ("incompetence") and a plural verb ("are"). Magistrate Judge Stickney is referred to as "it" instead of "he" and is called a "magistrate" instead of a "magistrate judge." And finally, the sentence containing the word "incompetence" makes no sense as a matter of standard English prose, so it is not reasonably possible to understand the thought, if any, that is being conveyed. It is ironic that the term "incompetence" is used here, because the only thing that is incompetent is the passage itself.