# `United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 18, 2025

Lyle W. Cayce
Clerk

—————————

No. 24-60035

—————————

M.K., *a minor by and through his father* and NEXT FRIEND, GREG KOEPP,

*Plaintiff—Appellant*,

*versus*

PEARL RIVER COUNTY SCHOOL DISTRICT; P.B., *a minor by and through his parents*; P.A., *a minor by and through his parents*; I.L., *a minor by and through his parents*; L.M., *a minor by and through his parents*; W.L., *a minor by and through his parents*; ALAN LUMPKIN, *individually and as Superintendent*; CHRIS PENTON, *individually and as employee*; AUSTIN ALEXANDER, *individually and as employee*; STEPHANIE MORRIS, *individually and as employee*; TRACEY CRENSHAW, *individually and as employee*; BLAKE RUTHERFORD, *individually and as employee*; JOHN DOES 1-10,

*Defendants—Appellees*.

—————————————————————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:22-CV-25

—————————————————————

No. 24-60035

Before Jolly, Graves, and Wilson, *Circuit Judges*.

Per Curiam:

After being homeschooled for years, M.K. enrolled in fifth grade in the Pearl River County School District (the District). At the start of his sixth-grade year, boys in four of M.K.'s classes bullied him. In three of those classes, boys called M.K. "gay," among other names meant to insult him. In October of that year, M.K. exposed his genitals to one of the boys in a restroom. M.K. has alternately stated that he did so accidentally and that he did so intentionally in an attempt "to prove that he was a boy, not a girl," and therefore not "gay." The District suspended M.K. and required him to attend an alternative school for six weeks before re-enrolling in the middle school. M.K. refused to do so, deeming it "essentially a prison." By and through his father, M.K. then sued the District, among others. M.K. now appeals the district court's summary judgment in favor of the District on his deliberate-indifference sex-discrimination claim under Title IX. We affirm.

## I.

In the spring of 2021, fifth-grade student M.K. enrolled in Pearl River Central Elementary School, a public school in Carriere, Mississippi. Up to that point, M.K. had been homeschooled. In response to the COVID-19 pandemic, his new elementary school held classes virtually for almost all of the spring semester. But the school allowed its students to attend classes in person for the last four weeks of the school year. During that time, M.K. made friends, but some boys teased him for being "dog water" (i.e., slang for "bad") at video games the boys played together on their computers at school. During his deposition, M.K. said that "wasn't that big of a deal," though. M.K. added that "there was also a kid that made fun of me just a little bit for being short. He did tease me, but he didn't really bully me." Asked if he

thought anyone bullied him during fifth grade, M.K. answered, "Not really." M.K. decided to remain in public school for sixth grade.

That meant going to a new school, Pearl River Central Middle School, in the fall of 2021. A couple weeks into the school year, M.K.'s relationship with other boys became "[a] little bit worse" than it had been in fifth grade. More boys, on a more frequent basis, teased M.K. for being bad at video games and for being short.

M.K. and other boys often arrived early to science class, their first class of the day, and played games on their computers until the class started. Science was the class in which boys "picked on [M.K.] the most." Several boys teased M.K. for being "dog water" at the video games, and one may have called M.K. "Trash." M.K. told his science teacher about the name-calling ten or so times; she told the boys to stop, but "[t]hey didn't really listen." At some point, M.K.'s mother spoke with the teacher "about [M.K.'s] behavior and paying attention in class" and "about people calling him names."

M.K. did not "have any problems with kids making fun of [him]" in his next class. After that, M.K. had band class, during which some boys called M.K. "gay." M.K. reported them to his band director once or twice after class; M.K. did not see her talk to the name-callers. M.K. thought the boys might have been calling him "gay" because he often wore "blue and red" or "bright" clothes. At the time, M.K. thought being gay meant that "[e]ither a boy wants to love another boy or a transgender." M.K. also sometimes thought that boys were calling him "gay" because they thought M.K. might be a girl. At some point, M.K. started "blowing kisses" at the boys calling him "gay" in an effort to "show[] them . . . what gay is and that [he was] not gay." "[T]hat made [the situation] worse."

After band, M.K. had math class.  There, M.K. "had problems" with one boy, who sat behind M.K. "whispering, calling [him] gay"; the boy also called M.K. "Gay Boy."  M.K. reported the boy to his math teacher two or three times.  The teacher talked to M.K and the other boy and told them that "she didn't want to hear it anymore."  By that, M.K. understood her to mean both that she did not want the other boy to call M.K. names anymore and that she did not want to hear M.K. talk about it anymore.  In mid-October, M.K.'s mother spoke with his math teacher about bullying but did not mention that another boy was calling M.K. "gay" because M.K. had not yet told his mother about that.

M.K. and the same boy that called him "gay" and "Gay Boy" were also in language arts class together.  There, M.K. had "[a]bout the same problems" that he had in math class.  At first, the two boys sat close to each other and argued about, in M.K.'s words, "how I'm not gay."  Eventually, M.K. told his teacher, and she moved the other boy to the opposite side of the classroom.  In history class, M.K.'s last class of the day, M.K. did not "have any issues."

During this time, M.K. got into a physical fight at school.  Between classes one day in mid-September, a boy walked up behind M.K. and M.K.'s friend, unzipped the friend's backpack, and then unzipped M.K.'s.  When the boy unzipped M.K.'s backpack, M.K. slapped the boy in the face, provoking the boy to shove him.  M.K. collided with a nearby pole, fell, and scraped his elbow on the sidewalk; he sustained no other injuries.  M.K. "think[s] [he] reported [the incident] to [his] next class teacher."  The next morning, M.K.'s father approached a school administrator about the incident and also told him that boys were calling M.K. "gay."  In his deposition, M.K.'s father testified that the administrator, "more or less . . . alluded to [M.K.'s being bullied], that he knew that certain kids were doing certain things," giving M.K.'s father the impression that school personnel "kn[e]w

things [were] happening . . . ."   M.K.'s father also testified that boys sometimes picked on M.K. as he walked into and out of school.

Another incident occurred that October.  M.K. and the boy who had been calling him names in his language arts and math classes both asked their language arts teacher to use the restroom.  M.K. alleged in his complaint that the boy "had been bullying [him] all day" and continued to harass him in the restroom.  So "M.K. decided to prove that he was a boy, not a girl"—and, in M.K.'s mind, prove that he was not gay—by exiting the stall he had used and exposing his genitals to the other boy.  In his deposition, however, M.K. told a rather different story.  M.K. testified that the boy was not calling him names in the restroom before the incident.  M.K. also stated that he used a urinal, rather than a stall, and that the other boy merely caught a reflection of M.K.'s genitals in the mirror as M.K. "turned around to fix [him]self up" and the other boy looked in his direction just as M.K. did so.

After the other boy reported the incident, M.K. admitted to a school official and to his parents that he had exposed himself.  And while M.K. denied to his language arts teacher that he had engaged in any wrongdoing, M.K. later admitted that he "wasn't telling [her] the full-on truth. [He] was just saying no, [he] didn't do it because [he] just didn't want to get a bad reputation or [get] kicked out of school."

The school suspended M.K. pending a disciplinary hearing.  After the hearing, the District suspended M.K. for the remaining six weeks of the semester and transferred him to Pearl River Central Endeavor School—an alternative school—for the duration of his suspension.   The hearing

committee also directed M.K. to "receive counseling services once a week."[1] M.K. and his parents opted to resume homeschooling because, in their view, "Endeavor is essentially a prison." After unsuccessfully appealing his fall semester punishment, M.K. sought to return to Pearl River Central Middle School for the spring semester, but the superintendent told him he still needed to attend the Endeavor School for six weeks.

In February 2022, M.K., by and through his father, sued the District, its superintendent, five named employees, ten John Does, and five classmates. In November 2022, the district court dismissed M.K.'s claims against his classmates for failure to prove service. In July 2023, the District, its superintendent, and the five named employees jointly moved for summary judgment. Opposing their motion, M.K. argued, *inter alia*, that M.K. experienced sex discrimination actionable under Title IX because boys called him "gay" and "Title IX's protections extend to sexual orientation based harassment," including "harassment due to a victim's perceived homosexuality."

In December 2023, the district court granted summary judgment on the only claim that M.K. is pursuing on appeal, his Title IX deliberate-indifference sex-discrimination claim against the District. The court concluded that Title IX does not reach sexual-orientation discrimination and that the behavior alleged here was insufficiently severe to be actionable in any event.

---

[1] M.K.'s mother had suggested that the disciplinary committee send M.K. to counseling, which she thinks could help him "learn what is . . . socially acceptable and not acceptable."

No. 24-60035

## II.

"We review a district court's grant of summary judgment *de novo*." *Moon v. Olivarez*, 26 F.4th 220, 226 (5th Cir. 2022). "Summary judgment shall be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting FED. R. CIV. P. 56(a)). "A dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). We "view[] the evidence in the light most favorable to [the nonmovant] and draw[] all reasonable inferences in his favor." *Id.*

## III.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, the Supreme Court held that "student-on-student sexual harassment, if sufficiently severe, can . . . rise to the level of discrimination actionable under [Title IX]." 526 U.S. 629, 650 (1999). "A school district that receives federal funds may be liable for student-on-student harassment if the district":

> (1) had actual knowledge of the harassment, (2) the harasser was under the district's control, (3) the harassment was based on the victim's sex, (4) the harassment was "so severe, pervasive, and objectively offensive that it effectively barred the victim's access to an educational opportunity or benefit," and (5) the district was deliberately indifferent to the harassment.

7

No. 24-60035

*Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (alteration accepted) (quoting *Davis*, 526 U.S. at 650); *see also I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 372 (5th Cir. 2019).

In *Sanches*, we affirmed summary judgment in favor of a school district because the plaintiff there had not proved that the harassment she alleged was based on sex or was sufficiently severe, or that the district was deliberately indifferent. 647 F.3d at 165–70. Here, the district court analyzed the based-on-sex and severity elements and concluded that M.K. had not proved either.[2] The parties and three *amici curiae* spill much ink on whether Title IX addresses discrimination on the basis of perceived and/or actual sexual orientation. And oral argument in this case centered on that question. But we need not answer it because this appeal can be resolved by applying binding precedent regarding the severity of the behavior alleged. Put differently, we agree with the district court that the student behavior alleged here was insufficiently "severe, pervasive, and objectively offensive" to be actionable. *Id.* at 166–67.

In *Davis*, the Supreme Court underscored that there are "very real limitations on a funding recipient's liability under Title IX." 526 U.S. at 652. The Court warned lower courts not "to impose more sweeping liability than [it] read Title IX to require." *Id.* In assessing such claims, "[c]ourts . . . must bear in mind that schools are unlike the adult workplace and that children

---

[2] The District also argued that it did not act with deliberate indifference, which is "an extremely high standard to meet." *I.F.*, 915 F.3d at 368 (citation and internal quotation marks omitted). But the district court did not address the deliberate indifference element because the court agreed with the District that M.K. failed to substantiate that the alleged harassment was either based on his sex or severe enough to sustain a claim. We likewise decline to address deliberate indifference, which the District discusses only in a footnote in its appeal brief.

may regularly interact in a manner that would be unacceptable among adults." *Id.* at 651.  The Court explained:

> [A]t least early on, students are still learning how to interact appropriately with their peers.  It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it.  Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender.  Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Id.* at 651–52.  Other than acknowledging that last sentence, from which the severity element derives, M.K. engages with none of this guidance from the Court.

To recap the facts:  Boys called M.K. names over roughly six weeks at the beginning of sixth grade.  In two of his six classes, M.K. had no issues with other students.  In the worst class for M.K., boys picked on him for being bad at video games.  In another class, some boys called M.K. "gay," prompting M.K. to report them once, or perhaps twice.  In the remaining two classes, the same boy called M.K. "gay" and "Gay Boy"; one of the teachers told the boys that she did not want to hear it, and the other teacher moved the boy to the opposite side of the classroom.  Once, a boy shoved M.K. after M.K. slapped him for unzipping M.K.'s backpack.  Finally, one day in a restroom, M.K. either intentionally exposed his genitals to a boy who was harassing him or accidentally exposed his genitals via the mirror to a boy who was not harassing him.  The District then directed M.K. to attend its alternative school for six weeks, but he refused.

Meanspirited though it was, the student behavior underlying this lawsuit does not meet "the Supreme Court's strenuous standard" for "severe, pervasive, *and* objectively offensive" conduct that "rises to the level of actionable harassment" under Title IX. *Sanches*, 647 F.3d at 167 (emphasis added); *see Davis*, 526 U.S. at 633. As this court has explained regarding student-on-student Title IX harassment claims, "to be actionable, the harassment must be more than the sort of teasing and bullying that generally takes place in schools." *Sanches*, 647 F.3d at 167. The behavior must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. Conduct like that which M.K. alleges "takes place every day in [middle] schools" across America and is "not the proper stuff of a federal harassment claim." *Sanches*, 647 F.3d at 167; *see Davis*, 526 U.S. at 651–52.

M.K. argues that any questions about the severity of his classmates' behavior "are questions for the factfinder, not for summary judgment." But that argument glosses over the Supreme Court's instruction that "[c]ourts . . . must bear in mind" that schoolchildren "often engage" in "upsetting" conduct and that "courts [must not] impose more sweeping liability than [*Davis*] read Title IX to require." 526 U.S. at 651–52. Heeding those instructions, this court affirmed summary judgment in favor of a school district in our seminal case about student-on-student Title IX harassment claims. *See Sanches*, 647 F.3d at 170. There, we concluded that summary judgment was appropriate because, even viewing the evidence in the light most favorable to the plaintiff, the alleged harassment was not severe, pervasive, *and* objectively unreasonable. *Id.* at 165–67.

Same here. As noted above, the substantive aspects of M.K.'s briefing on the severe-and-pervasive issue are wanting. On the facts, M.K. repeatedly describes the name-calling he experienced at Pearl River Central Middle School as "incessant." Elsewhere, M.K. asserts that boys called him names

"[i]n all but one of his classes." But the evidence shows that M.K. had no problems in two of his classes. In a third, the teacher moved the one boy who gave M.K. problems to the other side of the classroom. And while M.K. did not see his band director take any disciplinary action, M.K. reported his classmates to her only once or twice after class. These facts call into question the pervasiveness of the conduct that M.K. experienced.

Regardless, even the caselaw M.K. proffers to support his position brings into sharp relief the relative lack of severity of the behavior at issue here. He cites three Title IX cases that involved rape-related harassment. First, quoting *Sanches*, M.K. frames his case as presenting "the sort of 'daily mocking' that courts elsewhere ha[ve] recognized as actionable." But that line in *Sanches* is drawn from an unpublished, out-of-circuit decision about "daily mocking, for five weeks, of a student" who was "constantly called a 'liar' and a 'slut' after having been raped." 647 F.3d at 166 (quoting *Doe v. E. Haven Bd. of Educ.*, 200 F. App'x 46, 48 (2d Cir. 2006)). Given the sexual assault, such harassment is "undoubtedly more severe" than the name-calling here, just as it was compared to the name-calling at issue in *Sanches*. *Id.*

Next, M.K. quotes from *Roe v. Cypress-Fairbanks Independent School District*, noting that the plaintiff there was "called 'scum,' [and] 'a horrible human being'" and that our court concluded that the harassment at issue rose to the required level of severity. 53 F.4th 334, 340, 343 (5th Cir. 2022). But those taunts were only part of "the totality of the circumstances" in *Roe*: "Roe was accosted and accused of trying to get Doe arrested by falsely accusing him of rape, called 'scum,' 'a horrible human being,' and a 'baby killer[,]' tagged in pictures of dead fetuses, told . . . to kill herself, and threatened by Doe with his 'tool' comment" (i.e., reference to a gun). *Id.* at 343. The plaintiff "was harassed to the point of attempted suicide." *Id.* As

with the out-of-circuit decision cited by *Sanches*, the facts in *Roe* demonstrate the lack of severity here by comparison.

Finally, M.K. notes that—in a case about vulgar and vicious acts of sexual harassment that a rape victim endured at school—this court concluded that the severity element was met, mentioning the relatively mild facts that the student's classmates "talked about her loudly in her presence" and "excluded her during cheerleading." *I.F.*, 915 F.3d at 373. However, our court decided *I.F.*, as it did *Roe*, against a backdrop of much more severe harassment, involving allegations of sexual assault and ensuing in-person and online bullying. *Id.* Nothing of that magnitude happened here.

In sum, M.K.'s argument on appeal downplays pertinent Supreme Court guidance and draws support from inapposite cases involving markedly more severe behavior than is alleged to have occurred here. Reading those cases through the lens of *Davis*, we simply cannot say that the name-calling M.K. experienced over several weeks at the start of sixth grade was "so severe, pervasive, and objectively offensive that it effectively bar[red] [his] access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. On the undisputed record before us, what M.K. unfortunately endured was merely "the sort of teasing and bullying that generally takes place in schools." *Sanches*, 647 F.3d at 167. That is not sufficient to sustain his Title IX claim against the District.

The judgment of the district court is

AFFIRMED.

12