# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 21, 2015

Lyle W. Cayce
Clerk

No. 14-50040

JAMIE NEVILLS, as next friend A. N.; TROY NEVILLS, as next friend A. N.,

    Plaintiffs - Appellants

v.

MART INDEPENDENT SCHOOL DISTRICT,

    Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:13-CV-2

Before REAVLEY, SMITH, and SOUTHWICK, Circuit Judges.

PER CURIAM:*

    Jamie and Troy Nevills, as next friend of their son, A.N., brought this action against Mart Independent School District claiming the district violated the Americans with Disabilities Act and the Rehabilitation Act. The district court granted summary judgment in favor of the school district.

    We AFFIRM.

---

    * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-50040

## FACTS AND PROCEDURAL HISTORY

A.N. attended school in the Mart Independent School District ("MISD") from kindergarten until seventh grade, when his parents withdrew him as a result of the harassment underlying this suit.  It is disputed whether A.N. suffers from a form of Tourette Syndrome. The Nevillses produced a letter from a doctor stating that he suffers from "tic disorder."  MISD claims it was unaware of the disorder while A.N. was at MISD. The Nevillses point out that on one year's enrollment forms, they wrote "tics" in the "Other" category for particular medical conditions.  On another occasion, they gave a note to a school nurse explaining A.N.'s disorder and need for medications.  The disorder allegedly causes him to have facial and body tics, blurs his vision, and makes it difficult for him to speak or concentrate.

The complaint alleges several specific examples of bullying that occurred during A.N.'s fifth-, sixth- and seventh-grade years and other more general instances that spanned the entire period. The general instances mostly involved name-calling.  Students allegedly called A.N. "retard, chickenhead, twitch, tic-toc, and spaz."  A.N. stated that he frequently reported the name-calling, but was told to stop being a tattle-tale.  One teacher stated that she sent some students to the principal's office for name-calling on one occasion, but that they were never punished.

Other teachers punished A.N. for being a tattle-tale, including one instance in which a teacher required him to write "I will not be a tattle-tale" repeatedly.  He alleges that teachers also punished him when he exhibited tics and caused a disturbance.  His teachers, on the other hand, state that they merely asked him to step into the hallway to calm down when he caused disturbances and that they punished him for excessive tardiness or misconduct.

2

No. 14-50040

Regarding specific instances of bullying, A.N. alleges that in fifth grade a group of students took his clothes out of his locker during gym class and poured soap on them. Later that year, he alleges, they stole shoes from his locker; and when he wore new shoes to school, they threw the shoes in the toilet and urinated on them. He maintains that he reported the misconduct and that MISD failed to discipline any students. MISD, however, produced a disciplinary referral indicating an individual was punished for the shoe incident, stated that there was no evidence that they were taken as a result of A.N.'s disability, and noted that A.N. was assisted in washing his clothes and given clothes to wear for the remainder of the day.

A.N. was involved in physical altercations on two occasions in fifth grade. One involved a disagreement between A.N. and another student. Both A.N. and the other student were punished. In the other, A.N. alleged another student punched him while he was experiencing tics, saying he was trying to "fix them." A.N. states that he reported the incident, but that nothing was done because he did not report it until the next day. He alleges that later, the other student's father came to the school and threatened him in the lunch room. Middle School Principal Dr. Tawnya Nail states that she looked at video from that day at the cafeteria and talked to the other student's father. She determined the father made no threats. She also found that the altercation resulted from an argument between A.N. and the student that arose after the other student lost a classroom game, some name-calling, and the other student's having stepped on A.N.'s jacket. After the incident, Nail hired an outside organization to conduct teacher training on bullying, scheduled a presentation for the fifth- and sixth-grade boys on bullying, and made plans to have an outside organization lead a bullying program for students during the following fall.

No. 14-50040

The final fifth-grade incident occurred when A.N. and another student were cleaning tables in a classroom and the other student sprayed A.N. in the face with cleaning chemicals. A.N. had to go to the emergency room to have his eyes checked. Nail investigated the incident and found no indication – from A.N.'s, the teacher's, or the other student's reports of the incident – that the action was intentional. The school also took measures to adjust the way they cleaned the tables in the future.

In sixth grade, while A.N. was on crutches from an injury, a student knocked him down in the hallway. A.N. alleges the action was intentional and that another teacher witnessed it, but that nothing was done. He alleges students posted on Facebook that they were going to try to knock him down. The Nevillses reported the posts, but state that the school did nothing. Nail, however, emailed A.N.'s teachers about the posts and asked them to watch out for anyone attempting to push A.N. She interviewed the students who allegedly made the Facebook posts and disciplined one of them. Jamie Nevills states that the school superintendent told her that going to school to complain about the incidents only made matters worse for A.N.

In the seventh grade, A.N. was involved in a fight in the locker room. He alleged that a student "slammed [his] head against the wall" and "said he was going to break his arm." He states he was taken to the office and that he reported the incident. He also states that he started suffering from migraine headaches and that he has nerve damage above his right eye. Nail met with both boys and determined that they pushed each other and the fight started because A.N. turned off the lights in the locker room. Both boys were punished, and the administration removed students' access to the light switches.

A week later, A.N. alleges, he "freaked out because there was a spider on [his] instrument." He said the rest of the class was teasing him and the teacher told him to "quit being a baby." He left the classroom, without permission, to

4

tell an administrator what happened. Nail put him in a room in the office and told him to learn to control himself. He alleged he wet his pants during that time because he was denied access to a restroom. Nail went to get gym clothes for him to change into afterwards. Jamie Nevills went to deliver medicine and clothes after she was told what happened. She was denied access to A.N. because, she was told, it "would be a 'treat' for A.N. leaving class" without permission. Nail contends that A.N. yelled at her and other administrators in the office and that there were no visible signs that he had wet his pants. A.N. was given a Disciplinary Referral for "lack of cooperation, being rude and discourteous, and for leaving class without permission."

A few weeks later, a student ripped off A.N.'s "tear-away" pants, which snapped down the side, at a pep rally. A.N. was wearing shorts underneath and a long shirt. He alleges MISD's only response was to tell him not to wear those pants anymore. Nail alleges that the responsible student was given ten days of in-school suspension. Later that day, another student pushed A.N.'s face into the student's crotch. Nail investigated the incident and disciplined the student. The Nevillses removed A.N. from school shortly after and he transferred to another school. The Nevillses report that he has had no behavioral issues since the transfer.

The Nevillses filed suit against the school district, claiming it violated the ADA and Section 504 of the Rehabilitation Act. They claimed MISD was deliberately indifferent to peer-to-peer harassment on the basis of A.N.'s Tourette Syndrome and that MISD intentionally discriminated against A.N. They also claimed MISD retaliated against A.N. in violation of the ADA and Section 504. The retaliation claim was not raised on appeal.

MISD filed a motion for summary judgment, claiming that the Nevillses' claims were subject to the Individuals with Disabilities Education Act and therefore they had failed to exhaust administrative remedies. The district

court held that they had not failed to exhaust administrative remedies, but that claim is not at issue on appeal. MISD alternatively claimed the Nevillses had failed to demonstrate that: A.N. had a disability; he was harassed on the basis of the disability; that the harassment was severe and pervasive; MISD knew about the harassment; MISD was deliberately indifferent to the harassment; or MISD intentionally discriminated against A.N. on the basis of his disability.

The district court granted MISD's motion for summary judgment. It found there were genuine disputes of fact regarding whether A.N. had a disability as defined by the ADA and Section 504 and whether MISD had knowledge of the disability and the harassment. But the court found the Nevillses failed to establish genuine disputes of fact regarding whether the alleged harassment or discrimination was based on the disability and whether MISD was deliberately indifferent to the harassment. The Nevillses appealed.

## DISCUSSION

"We review a grant of summary judgment de novo, applying the same legal standards as do the district courts." *Vuncannon v. United States*, 711 F.3d 536, 538 (5th Cir. 2013). Summary judgment is proper when viewing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

We first consider whether the district court erred in granting summary judgment on the Nevillses' claim of peer-to-peer harassment due to a disability. This court recently analyzed a Section 504 or ADA[1] claim based on peer-to-

---

[1] The analysis under Section 504 and the ADA is the same. "Congress' intent was that Title II extend the protections of the Rehabilitation Act to cover all programs of state or local governments, regardless of the receipt of federal financial assistance. . . . Jurisprudence

peer harassment for the first time. *See Estate of Lance v. Lewisville ISD*, 743 F.3d 982 (5th Cir. 2014). We derived a version of the elements for peer-to-peer sexual harassment claims from a Supreme Court opinion to analyze the peer-to-peer harassment claim. *See id.* at 995 (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)). We held, to survive summary judgment in a Section 504 or ADA peer-to-peer harassment case, a plaintiff must demonstrate a genuine issue of material fact as to the following:

> (1) he was an individual with a disability, (2) he was harassed based on his disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his education and created an abusive educational environment, (4) [defendant] knew about the harassment, and (5) [defendant] was deliberately indifferent to the harassment.

*Id.* at 996 (citation and quotations omitted). The district court used the same analysis, though it reached its decision before *Lance* was issued. The parties argue vigorously about whether there is a genuine dispute of material fact as to each of the five elements under *Lance*. It is sufficient for us to explain why we conclude there is no genuine dispute of material fact regarding the fifth element, which concerns deliberate indifference.

In *Lance*, we held a school district was not liable for peer-to-peer harassment when the plaintiffs failed to demonstrate that the school was deliberately indifferent. *Id.* at 996. Examining *Davis*, we explained that the deliberate indifference standard does not require schools to "purge" themselves of harassment and that the standard grants a high level of deference to a school's judgment. *Id.* at 996-97. "The deliberate-indifference inquiry does not transform every school disciplinary decision into a jury question." *Id.* at 997 (citation and internal quotations omitted). We noted that the district court

---

interpreting either section is applicable to both." *Hainze v. Richards*, 207 F.3d 795,799 (5th Cir. 2000) (citations and internal quotations omitted).

found several instances where the school district had chosen inaction. *Id.* We held, though, "despite this broad negative characterization, the summary-judgment evidence as to bullying incidents involving [the plaintiff] demonstrates that the School District responded in a manner that precludes a jury finding of deliberate indifference." *Id.*

In *Lance*, the evidence showed that the principal investigated alleged altercations, punished students involved, talked to students in instances where punishment was not warranted, spoke with parents of involved students, monitored behavior, removed the plaintiff from situations when his own behavior caused problems, and utilized anti-bullying training programs. *Id.* at 997-99.

The Nevillses highlight the lack of evidence of students being punished for name-calling and argue that the school did not punish several other students involved in one of the fights, the cleaning spray incident, and the crutches incident. MISD uses Nail's affidavit and her written notes from investigations of these incidents to support her decisions to discipline some students and not others. In addition, MISD provided, to students and teachers, training to counter bullying. That training was conducted using "two nationally-recognized programs designed to teach kindness and compassion to students."

In light of the high level of deference *Lance* granted to schools, we hold that MISD was not deliberately indifferent to harassment. Therefore, the district court did not err in granting summary judgment on the deliberate indifference element.

We now turn to the Nevillses' second issue and consider whether the district court erred in granting summary judgment in favor of MISD on the Nevillses' intentional discrimination claim. A disability-based intentional discrimination claim requires a plaintiff to show: "(1) that he has a qualifying

disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). Furthermore, compensatory damages are only available if the plaintiff also shows intentional discrimination. *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002). Because the existence of a qualifying disability was discussed above, only the second two elements need be discussed here.

The Nevillses base their entire discrimination claim on the argument that teachers sent A.N. out of class because of behaviors caused by his disability. In response, MISD argues that no behavior documentation from the school district indicates that A.N.'s disability was the basis for any punishment. MISD alleges that he was removed only because of disruptive behavior, unexplained tardiness and absences, or inability to get along with others at school. The district court found that there was insufficient evidence that MISD ever punished A.N. as an act of intentional discrimination. We agree. There is insufficient evidence that A.N. was ever removed from class due to intentional discrimination based on his disability.

AFFIRMED.