# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-40722

United States Court of Appeals
Fifth Circuit

**FILED**
February 8, 2019

Lyle W. Cayce
Clerk

I.F.,

Plaintiff–Appellant,

versus

LEWISVILLE INDEPENDENT SCHOOL DISTRICT,

Defendant–Appellee.

Appeal from the United States District Court
for the Eastern District of Texas

Before SMITH, DUNCAN, and ENGELHARDT, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

I.F., a former student, sued Lewisville Independent School District ("LISD") for violating Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 (2012), claiming that LISD was deliberately indifferent to her alleged sexual harassment and retaliated against her by withholding Title IX protections. LISD moved for summary judgment, and I.F. moved for partial summary judgment. The district court granted in part and denied in part

No. 17-40722

LISD's motion, finding that whereas the evidence did not establish a genuine dispute of material fact regarding whether LISD was deliberately indifferent to I.F.'s reports of sexual harassment and bullying, there was a genuine dispute of material fact regarding the retaliation claim. The court also denied I.F.'s motion. I.F. appeals, challenging only the summary judgment on deliberate indifference. We affirm.

I.

I.F. was a ninth-grade student at the Hebron High School Ninth Grade Campus ("Hebron") in LISD during the 2012–13 school year. On Friday, September 28, 2012, she attended a non-school-sponsored, non-school-affiliated party at the private residence of fellow Hebron student S.S. at which no LISD personnel were present. At the party, A.V. and I.G. engaged in sexual activity with I.F., which she claims was rape.

When I.F. returned to school on Monday, her classmates began to harass and bully her. According to the complaint, they called her a "whore" and a "slut," asked whether she had sex with multiple people, and inquired "how did it feel to be fucked in every single hole of your body?" A.V. "wore the pants that he raped [I.F.] in to school, which had [her] blood on them from intercourse, and stood on the lunch table and said, these are the pants that I took [I.F.'s] virginity in."

I.F. informed her mother, Jaime Fletcher ("Fletcher"), that she was being bullied, and on October 10, Fletcher contacted Hebron counselor Debra Denson-Whitehead to report the bullying but said nothing about sexual activity or assault.[1] Denson-Whitehead told Fletcher that she would speak with

---

[1] Fletcher stated during her deposition that she told Denson-Whitehead that "there's something . . . horribly wrong. Something happened. I don't know what, but my daughter is being severely bullied, and it's really bad." Ms. Fletcher also told Denson-Whitehead that

No. 17-40722

I.F. about the bullying when I.F. returned to school. But on Friday, October 12, when I.F. next attended school, before Denson-Whitehead could speak with I.F., Fletcher emailed Denson-Whitehead and told her not to speak with I.F. that day about the bullying. Denson-Whitehead complied and informed Fletcher that she would check in with I.F. the following week. Nevertheless, I.F. never physically attended any LISD school after October 12.

That same day, I.F.'s parents ("the Fletchers") learned for the first time from other parents at a football game that I.F. allegedly had been sexually assaulted. The Fletchers reported the assault to the Carrollton Police Department ("CPD"), which opened an investigation.

On Monday, October 15, the Fletchers met with Denson-Whitehead to inform her that I.F. had been sexually assaulted at a party by two Hebron students and that they had reported the assault to CPD, which had opened an investigation. The Fletchers also gave Denson-Whitehead a list of students who they believed were involved. This meeting was the first time that Denson-Whitehead learned of I.F.'s alleged sexual assault. Denson-Whitehead alleges that she expressed her shock and sorrow to the Fletchers and advised them that she would notify the administration. According to the Fletchers, Denson-Whitehead told them that "it was going to be very difficult going against the football team" and that "the best thing for [I.F.] would be to transfer schools." After the meeting, Denson-Whitehead conveyed the information she had learned regarding the sexual assault to Hebron Assistant Principal Amanda Werneke and Hebron School Resource Officer Cole Langston, who was also a police officer at CPD.

---

she didn't know whether the bullying was cheerleading bullying, and there was a senior who was "saying something," but she "didn't have any names."

No. 17-40722

On October 16, 2012, Denson-Whitehead reported the same information to Hebron Principal Mark Dalton. Dalton, Denson-Whitehead, and Werneke consulted with Langston about the alleged assault. Langston confirmed that CPD had opened a case and was investigating the sexual assault. He requested that Hebron refrain from investigating the matter until CPD informed LISD that it could proceed because any LISD investigation could interfere with and potentially compromise the criminal investigation. Dalton interpreted that request to apply to both Fletcher's complaint that I.F. was being bullied and I.F.'s alleged sexual assault. Furthermore, both Dalton's and Denson-Whitehead's concerns about I.F.'s alleged sexual assault took precedence over the previously reported bullying.[2]

During this time, I.F. was not attending school, so LISD took steps to ensure that she earned credit for the classes she was taking. First, Dalton and Denson-Whitehead worked together with I.F.'s teachers to get I.F. the work she needed to complete her first-grading-period classes. Dalton also requested that the teachers be flexible and informed them that I.F. need not complete all work that was expected from students who were regularly attending class.

Second, Denson-Whitehead informed the Fletchers of several options for I.F. to continue her education, including continuing to attend Hebron, enrolling in Texas Tech online/correspondence courses, or transferring to a charter school. The Fletchers did not choose any of those options. Though they desired that I.F. return to Hebron, this was not an option unless her alleged assailants were removed from the school, and the online courses were outside their budget. Instead, after finding out about the LISD Homebound program from the

---

[2] Denson-Whitehead stated in her affidavit that "[w]hile not minimizing the purported bullying of I.F., she considered [the] report of an alleged rape to be much more serious . . ., particularly given that Mrs. Fletcher had asked [her] . . . not to talk to I.F. about the bullying."

No. 17-40722

Children's Medical Center in Dallas, the Fletchers requested that LISD place I.F. into that program.

LISD's Homebound program allows students who are unable to attend school for an extended period of time, for medical reasons, to work from home and receive credit. LISD requires a physician's recommendation before a student may be placed into the program. The Fletchers obtained that recommendation, and LISD enrolled I.F. in the Homebound program by October 30, where she remained for the rest of the 2012–13 school year.

In early October 2012, Brian Brazil, Hebron High School's head football coach and athletic coordinator, was informed by a freshman football coach that some of the football players may have been involved in a party, where alcohol was consumed, thrown by S.S., a member of the freshman team. Brazil held a meeting with all the football players, where he discussed the rumor of alcohol consumption at a party and reminded them that LISD's Extra-Curricular Code of Conduct prohibited the consumption of alcohol.

Following the meeting, he spoke with S.S. individually about the party, including asking about the presence of alcohol and drugs. S.S. admitted that he had consumed alcohol at the party, but falsely stated that no other football players were present at the party. Brazil suspended S.S. for two games for violating the alcohol consumption prohibition and spoke with S.S.'s father about his meeting with S.S.

During the team-wide meeting and the individual meeting with S.S., Brazil discussed the party only in relation to alcohol and drugs. At that time, he did not know anything about the alleged sexual assault. Before he could interview other players, the Hebron administration advised him that the police were conducting an investigation into the party and that he should not speak with anyone else about the party.

5

No. 17-40722

At the end of October 2012, Langston informed LISD that CPD had sufficiently progressed in its investigation of alcohol and drug consumption at the party that LISD could proceed with its own investigation of alcohol and drug consumption. Soon thereafter, at the beginning of November, Dalton instructed Brazil to investigate the alcohol consumption issue with the football players. Brazil interviewed several more players, including A.V. and I.G.; at no point during any of those meetings was there mention of an alleged sexual assault or alleged sexual misconduct by anyone at the party. After completing his investigation, Brazil reported to Dalton that only one student had admitted to drinking and had been disciplined.

In either early November or mid-December, the police authorized LISD to proceed with its investigation into I.F.'s allegation of sexual assault.[3] During that time, LISD schools were closed for both Thanksgiving break (November 20–25, 2012) and Christmas/New Years break (December 21, 2012, to January 6, 2013). Beginning in early January 2013, Hebron conducted two simultaneous investigations regarding I.F.: one concerning the allegation of sexual assault and another concerning I.F.'s allegations of being cyberbullied.

Werneke led both investigations. For the sexual assault investigation, during the month of January 2013, LISD interviewed fourteen students, including A.V. and I.G. On February 19, LISD followed up with four students, again including A.V. and I.G., interviewing them a second time. Throughout the interviews, A.V. and I.G. were represented by counsel and did not answer all of LISD's questions. Nevertheless, A.V. and I.G. insisted that the sexual activity with I.F. was consensual. LISD also interviewed I.F., with her lawyer

---

[3] The parties disagree regarding when CPD authorized LISD to proceed with its investigation into sexual assault. LISD contends that the authorization occurred in mid-December; I.F. asserts that it occurred in early November.

present, and she gave a written statement.

LISD's investigation revealed that no adults or LISD personnel witnessed the events at the September 28, 2012, party. Furthermore, the witnesses gave conflicting accounts regarding who was involved, precisely what had occurred, how intoxicated the students were, and whether I.F.'s sexual activity with A.V. and I.G. was consensual. LISD found that it did not have sufficient evidence that I.F. was sexually assaulted at the party. LISD concluded, therefore, that there was no basis for any discipline for sexual assault.

For the cyberbullying investigation, Werneke first became aware that I.F. was being cyberbullied as she was beginning the sexual-assault investigation when Fletcher explained the situation in person and provided Werneke a list of names and the Twitter posting that had started the cyberbullying. Assisted by Dalton and Assistant Principals Michael Vargas and James Scott, Werneke interviewed nineteen students in early-to-mid-January and reviewed several social media posts and photographs that Fletcher had provided. The investigation revealed that the cyberbullying complaint stemmed from Twitter tweets and retweets by Hebron High School students on or around December 31, 2012, and January 1, 2013, and that appeared to be in response to a tweet by I.F. regarding Christianity. Many of the implicated students had not themselves tweeted but had merely retweeted or liked a comment by another student.

LISD concluded that those social media posts did not amount to "bullying" as defined by LISD policy because there was no indication that they occurred while the students were on school property or at a school-sponsored activity, they did not threaten harm to I.F.'s person or property, and they were not sufficiently pervasive to create a harassing environment. Nevertheless, LISD did consider the postings "improper and hurtful," so LISD counseled the

No. 17-40722

interviewed students about improper social media conduct, advised them not to engage in such behavior, and contacted their parents. Werneke received no further complaints from the Fletchers regarding cyberbullying by the individuals involved in this phase of the cyberbullying investigation.

On February 19, however, Fletcher informed Werneke of a different form of cyberbullying I.F. was experiencing, this time arising from photographs and harassing comments posted on two Instagram accounts. The next day, Werneke reported the complaint to Langston and Dalton, and CPD began an investigation. Langston interviewed several Hebron students, including J.J.D., who later admitted that he had created one of the Instagram accounts and was responsible for all of the account's posts.[4] The police charged J.J.D. with criminal harassment, and LISD suspended him for three days and then assigned him to the Disciplinary Alternative Education Program for thirty days as punishment. After the Instagram cyberbullying complaint, the Fletchers made no other cyberbullying complaints.

Once LISD had completed the sexual assault and cyberbullying investigations, it reported its findings to the Fletchers by letter dated April 5, 2013. I.F. completed her ninth-grade coursework through the Homebound program and advanced to the tenth grade at the end of the 2012−13 school year. Thereafter, the Fletchers withdrew her from LISD, and she never returned there as a student.

## II.

I.F. sued LISD for violating Title IX, asserting that LISD was deliberately indifferent to her alleged sexual harassment and retaliated against her

---

[4] The other account was created by a former LISD student who had left LISD and was attending a private school in Carrollton.

## No. 17-40722

by withholding Title IX protections.  LISD moved for summary judgment on all of I.F.'s claims, and I.F. moved for partial summary judgment to establish that she had proved two essential elements of her claims: (1) that she was sexually assaulted by two classmates and (2) that she engaged in an activity protected under Title IX.  The magistrate judge ("MJ") granted LISD's motion and denied I.F.'s, determining that the alleged sexually harassing conduct was not "severe, pervasive, or objectively unreasonable," that LISD's responses to I.F.'s allegations of sexual assault, bullying, and cyberbullying were not deliberately indifferent, and that I.F. had failed to show any evidence of retaliatory actions by LISD.

I.F. objected to the MJ's order and report and recommendation in the district court.  Considering the parties' motions *de novo*, the district court granted in part and denied in part LISD's motion, finding that whereas the evidence did not establish a genuine dispute of material fact regarding whether LISD was deliberately indifferent to I.F.'s reports of sexual harassment and bullying,[5] there was a genuine dispute of material fact regarding I.F.'s retaliation claim.  The retaliation claim proceeded to trial, and a jury returned a verdict in favor of LISD.

On appeal, I.F. challenges only the summary judgment for LISD on the deliberate indifference claim.  She asserts that summary judgment was inappropriate because (1) the question of whether a school district acted with deliberate indifference generally should be decided by a jury; (2) the summary judgment evidence contained a factual dispute regarding when LISD should have commenced its investigation into I.F.'s reports of sexual assault, harassment,

---

[5] Though the district court agreed with the MJ on this point, it found that I.F.'s harassment was sufficiently severe, pervasive, and objectively offensive so as to have had a concrete, negative effect on her access to education.

No. 17-40722

and bullying; and (3) "allowing deliberate-indifference claims to be resolved by jury deliberations . . . serves the underlying purpose of discouraging gender-based[6] discrimination, which is the very purpose for which Title IX was enacted in the first place."

## III.

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "A school district that receives federal funds may be liable for student-on-student harassment if the district (1) had actual knowledge of the harassment, (2) the harasser was under the district's control, (3) the harassment was based on the victim's sex, (4) the harassment was so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit, and (5) the district was deliberately indifferent to the harassment." *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (citation and internal quotation marks omitted).

For a school district to be liable under Title IX, it must have been deliberately indifferent to student-on-student harassment. "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). A school district's "response to the harassment or lack thereof [must be] clearly unreasonable in light of the known circumstances." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). Because "deliberate indifference . . . is . . . a lesser

---

[6] I.F.'s reference to "gender" is entirely inappropriate. This case is about sex, not gender. Title IX addresses sex and never mentions gender. We will flexibly treat I.F.'s claims as regarding sex discrimination.

No. 17-40722

form of intent rather than a heightened degree of negligence," *Leffall v. Dall. Indep. Sch. Dist.*, 28 F.3d 521, 531 (5th Cir. 1994) (citation and internal quotation marks omitted), neither negligent nor merely unreasonable responses are enough, *Sanches*, 647 F.3d at 167.[7] "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference . . . ." *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998).[8] Indeed, as the district court noted, our precedent "makes it clear that negligent delays, botched investigations of complaints due to the ineptitude of investigators, or responses that most reasonable persons could have improved upon do not equate to deliberate indifference."[9]

School districts enjoy flexibility in responding to student-on-student harassment and "may tailor their responses to the circumstances." *Lance*, 743 F.3d at 1000. Title IX does not require school districts to purge themselves of harassment, take specific disciplinary actions, nor comply with parents' remedial demands. *Davis*, 526 U.S. at 648. Even a school district's "failure to comply with [its] regulations . . . does not establish the requisite . . . deliberate indifference." *Sanches*, 647 F.3d at 169 (citation omitted). Given this flexibility, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648.

---

[7] *See also Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference entails something more than mere negligence . . . .").

[8] *See also Sanches*, 647 F.3d at 168 ("Ineffective responses . . . are not necessarily clearly unreasonable.").

[9] *See Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 997 (5th Cir. 2014) (determining that the district's response to complainant's bullying, despite several instances of inaction, was not deliberately indifferent); *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 388–89 (5th Cir. 2000) (holding that the district was not deliberately indifferent despite its having erroneously concluded that the complainant had not been sexually assaulted); *Leffall*, 28 F.3d at 531–32 (finding that the district's decision to hire two unarmed security guards for a school dance where a student was fatally shot established a lack of deliberate indifference despite awareness of the risk of violence).

11

No. 17-40722

Accordingly, the strict nature of the deliberate indifference standard and the considerable flexibility school districts exercise in responding to harassment counsel that "Title IX does not require flawless investigations or perfect solutions." *Sanches*, 647 F.3d at 170. Instead, school districts "must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 649.

IV.

I.F. asserts that "generally," "[t]he question of whether an action by a school district is 'clearly unreasonable,'" and therefore, that the school district was deliberately indifferent, "should . . . be decided by juries." Though she acknowledges that judgment as a matter of law ("JML") on deliberate indifference is permissible "[i]n an appropriate case," *id.*, she relies on principles from civil rights jurisprudence and qualified immunity to contend that the "Supreme Court would prefer the deliberate-indifference issue to be resolved by juries rather than judges."

I.F. first maintains that because the Supreme Court adopted the deliberate indifference standard from its civil rights jurisprudence, where the question of deliberate indifference is routinely placed before juries, the issue should be decided by a jury in the Title IX context as well. Second, she states that because the public policy underlying qualified immunity for individual governmental employees does not apply to school districts, the question whether a school district's response to student-on-student harassment was not clearly unreasonable, and therefore not deliberately indifferent, should be a question of fact for a jury to decide. I.F. also attempts to distinguish *Sanches* by interpreting it to have found, unlike in the current case, "that there was no evidence in the record of sexual-based harassment . . . and, therefore, as a matter of law, the defendant school district could not have been deliberately indifferent to it."

No. 17-40722

I.F.'s assertions conflict with uncontroverted Supreme Court and Fifth Circuit precedent, and her analogies to disparate areas of law are unavailing.

First, the Supreme Court and this court recognize that in ruling on a motion for summary judgment, a district court can determine, as a matter of law, that a party was not deliberately indifferent. "The deliberate-indifference inquiry does not transform every school disciplinary decision into a jury question." *Nevills v. Mart Indep. Sch. Dist.*, 608 F. App'x 217, 221 (5th Cir. 2015) (per curiam) (citation omitted). Instead, "[i]n an appropriate case, there is no reason why courts, on a motion . . . for summary judgment, . . . could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649. "Whether an official's response to actual knowledge of discrimination amounted to deliberate indifference . . . may appropriately be determined on summary judgment." *Doe*, 220 F.3d at 387.

Following these principles, we have repeatedly upheld summary judgments after finding, as a matter of law, that a school district's response to harassment was not deliberately indifferent.[10] In the context of Title IX student-on-student harassment claims, summary judgment remains an appropriate tool, and courts may grant summary judgment if there is no genuine dispute of material fact regarding deliberate indifference. *See Doe*, 153 F.3d at 220 n.8. Therefore, I.F.'s claim that courts should generally allow juries to decide the question of deliberate indifference is merely an advocacy position not grounded in the law.[11]

Second, I.F.'s attempt to rely on principles of qualified immunity is

---

[10] *See, e.g.*, *Nevills*, 608 F. App'x at 222; *Lance*, 743 F.3d at 997, 1000–01; *Sanches*, 647 F.3d at 167–70; *Doe*, 220 F.3d at 387–89.

[11] Moreover, I.F. concedes that we have "issued several opinions in recent years in which [we have] affirmed summary judgments on deliberate-indifference claims arising out of student-on-student harassment."

meritless. Qualified immunity is not implicated in this appeal, and the doctrine does not speak to whether I.F. raised a genuine dispute of material fact on deliberate indifference to avoid summary judgment. Therefore, the alleged fact that questions of qualified immunity are often resolved as a matter of law and that LISD cannot assert qualified immunity here, has no import in resolving whether a district court may decide deliberate indifference as a matter of law.

Third, in attempting to distinguish *Sanches*, I.F. misconstrues its findings. Contrary to I.F.'s assertion, *Sanches* held the opposite and explicitly stated that "the district was not deliberately indifferent." *Sanches*, 647 F.3d at 170. Accordingly, I.F.'s claim—that the question whether an action by a school district was clearly unreasonable, and, thus, that the district was deliberately indifferent, should generally be decided by a jury—is meritless.

## V.

I.F. claims that a district court's finding, as a matter of law, that a school district was not deliberately indifferent instead of allowing a jury to decide the question "dissuades . . . potential future victims from pursuing their legal remedies, thereby rewarding those who engage in the conduct that Title IX was enacted to deter." She likens her case to those of black plaintiffs "50 years ago" and asserts that "this Court should not conclude today that Texans' perceived love of high-school football should eviscerate a young woman's right to a jury trial when her gender-discrimination claim potentially threatens the success of an all-male football team." At its core, I.F.'s policy reasoning is that allowing claims of Title IX student-on-student harassment to be decided by a court on summary judgment is contrary to Title IX's "purpose" and will "eviscerate the statute[] that w[as] designed to prevent prejudice." I.F.'s theory is unpersuasive.

14

The law on whether a district court can grant summary judgment on Title IX student-on-student harassment claims is settled.  Summary judgment on Title IX claims is appropriate if there are no genuine disputes as to material facts and the moving party is entitled to JML, and the Supreme Court agrees. *Davis*, 526 U.S. at 649.  The district court did precisely that, granting summary judgment to LISD because "I.F. has not shown the existence of a material issue of fact under the objective standard applicable to review of a Title IX deliberate indifference claim."  Though I.F. attempts to alter this law by relying on assertions regarding the purpose of Title IX and the alleged consequences of granting summary judgment on these types of claims, her points are untenable. Their logical endpoint is that a court would never be able to grant summary judgment against a claimant without essentially declaring that the movant's interests are more important than the claimant's right to be free from Title IX discrimination.  Consequently, I.F.'s points conflict with settled law.

I.F. further supports her policy reasoning by misconstruing a statement by the district court regarding high school football.  I.F. states that the court "tacitly" acknowledged that "jurors in the Eastern District of Texas will place a greater emphasis on preserving a successful high-school football team than on other conceivable public-policy goals," such as preventing student-on-student harassment under Title IX.  I.F. uses this interpretation to urge that the district court should not be allowed to decide that jurors will favor high school football as a matter of law, and, therefore, that the question of deliberate indifference should be decided by a jury.  Understood in context, however, the district court's statement was merely an explanation of why Denson-Whitehead's comment that I.F. would encounter difficulties if she "went against the football team" was a legitimate, if inartful, concern.  Therefore, I.F. cannot use the district court's observation to support her assertion that by

15

allowing courts to grant summary judgment on Title IX claims, they would be countenancing putting football above preventing Title IX harassment and eviscerating the antidiscrimination protections afforded by the statute.

## VI.

Liability for student-on-student harassment under Title IX requires the claimant to prove each of five elements. Therefore, to prevail on summary judgment for a claim of student-on-student harassment, a defendant school district, as the moving party, must demonstrate that there is no genuine dispute as to any one of the following material facts and that it is therefore entitled to JML: "(1) [The district] had actual knowledge of the harassment, (2) the harasser was under the district's control, (3) the harassment was based on the victim's sex, (4) the harassment was so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit, and (5) the district was deliberately indifferent to the harassment." *Sanches*, 647 F.3d at 165 (citation and internal quotation marks omitted).

I.F. and LISD do not dispute prong (2) or (3): I.F.'s harassers, as students, were under LISD's control, and the harassment was based on I.F.'s sex. The parties dispute the other elements. Based on a *de novo* review of the record, viewing the evidence in the light most favorable to I.F., we determine that summary judgment is appropriate in LISD's favor because there is no genuine dispute that LISD was not deliberately indifferent to I.F.'s claims of harassment.

## A.

The first material fact is whether LISD had actual knowledge of the harassment. I.F. asserts two distinct allegations of harassment: a sexual

assault on September 28, 2012, and incidents of sexual harassment following the alleged sexual assault in the form of bullying and cyberbullying. The bullying consists of three episodes: (1) bullying and harassment by fellow students in the two weeks following the alleged sexual assault, (2) cyberbullying comprising Twitter posts, retweets, and likes that occurred on or around December 31, 2012, and January 1, 2013, and (3) cyberbullying in the form of harassing Instagram posts in February 2013.

First, for the sexual assault allegation, LISD had actual knowledge of the harassment on October 15, 2012, when the Fletchers reported it to Denson-Whitehead. By October 16, Denson-Whitehead had reported the information she had learned regarding the sexual assault to Dalton and Werneke. Second, for the bullying complaint, LISD had actual knowledge of the harassment on October 10, when Fletcher contacted Denson-Whitehead to report that I.F. was being bullied. Denson-Whitehead informed Dalton of the bullying complaint by October 16. Third, for the Twitter cyberbullying complaint, LISD had actual knowledge of the harassment on January 7, when Fletcher went to Hebron and provided Werneke with a list of students who she claimed had been cyberbullying I.F. on Twitter and a copy of the alleged post that had started the harassment. Fourth, for the Instagram cyberbullying complaint, LISD had actual knowledge of the harassment on February 19, when Fletcher contacted Werneke and told her about photographs and harassing comments posted by two Instagram accounts. The next day, Werneke reported the complaint to Dalton.

LISD does not dispute that it had actual knowledge of the sexual assault and two forms of cyberbullying on the dates set forth above, but it does assert that it did not have actual knowledge of "any sex-based bullying in connection with the October 10, 2012, report" because Fletcher's complaint to Denson-

Whitehead on that date did not implicate Title IX.  LISD maintains that Fletcher merely described that I.F. was being bullied generally, or at most, was experiencing cheerleading bullying, but Fletcher did not give any information that would lead Denson-Whitehead to believe the bullying was sex-based.

Nevertheless, LISD's contention is better directed at the question of LISD's deliberate indifference, not whether it had actual knowledge of the bullying.  Based on the evidence, it is indisputable that LISD had actual knowledge, through Denson-Whitehead, that I.F. was being bullied in some manner. Though the parties may dispute whether LISD's response to that knowledge was deliberately indifferent, the fact is that LISD knew of the harassment on that day.

### B.

The second material fact is whether the harassment was so severe, pervasive, and objectively offensive that it effectively barred I.F.'s access to an educational opportunity or benefit.  The MJ and the district court reached different conclusions.  The MJ determined that the harassing conduct I.F. endured "was not severe, pervasive, or objectively unreasonable," nor did it have a concrete, negative effect on her access to education.  Conversely, the district court found that there was a genuine dispute concerning this material element.  The court determined that I.F. had provided evidence that, "if believed by a jury, could be a basis for a jury finding that the sexual harassment was so severe, pervasive, or objectively unreasonable so as to have had a concrete, negative effect on I.F.'s access to education."  Although neither side challenges this finding on appeal, we are not bound by the parties' agreement but must review the summary judgment *de novo*.  *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 328 (5th Cir. 2017) (per curiam).  Based on that *de novo* review, viewing the evidence in the light most favorable to I.F., we determine that I.F.

has demonstrated a genuine dispute as to a material fact, namely, whether the harassment she endured was so severe, pervasive, and objectively offensive that it effectively barred her access to an educational opportunity or benefit.

First, I.F. has raised a genuine dispute as to whether the harassment she endured was severe, pervasive, and objectively offensive. Her classmates called her a "whore" and a "slut." They spread rumors about her, talked about her loudly in her presence, and excluded her during cheerleading. One student asked her the race of the baby she would be having. Others asked whether she had sex with multiple people and "how did it feel to be fucked in every single hole of your body?" A.V., one of the students I.F. asserts raped her, "wore the pants that he raped [I.F.] in to school, which had [her] blood on them from intercourse, and stood on the lunch table and said, these are the pants that I took [I.F.'s] virginity in." Multiple football players called her a liar and told her that she was "going to ruin everything." The harassment continued online, with students commenting about I.F.'s alleged assault on Twitter and Instagram. As a result of the harassment, I.F. felt suicidal and depressed, began cutting herself, had nightmares, and experienced panic attacks. Therefore, she has demonstrated a genuine dispute regarding whether the harassment was severe, pervasive, and objectively offensive.

Second, I.F. has raised a genuine dispute as to whether the harassment effectively barred her access to an educational opportunity or benefit because she provided evidence that she felt that she could not return to Hebron on account of the harassment. In her statement of events dated February 8, 2013, I.F. stated that "I asked [my parents] to pull me out of school because of the bullying, and that I didn't want to be there with those two boys who raped me." "I thought once the police and school heard about what happened to me that they would arrest the boys and kick them out of school and I could go back to

19

No. 17-40722

school, but no!"  I.F. also asserted during her deposition that Fletcher had informed LISD that I.F. could not "be going to the same school as [her] rapists." Accordingly, I.F. has presented sufficient evidence to raise a genuine dispute as to a material fact, namely, that the harassment she endured was so severe, pervasive, and objectively offensive that it effectively barred her access to an educational opportunity or benefit.

C.

The third material fact is whether LISD was deliberately indifferent to the harassment.  The MJ and the district court agreed that "there is no issue of fact as to whether the district was deliberately indifferent."  Based on a *de novo* review of the record, viewing the evidence in the light most favorable to I.F., we determine that I.F. has failed to demonstrate a genuine dispute of material fact to show that LISD's responses to I.F.'s alleged sexual assault on September 28, 2012, and incidents of sexual harassment following the alleged sexual assault in the form of bullying and cyberbullying, were deliberately indifferent.  Therefore, LISD is entitled to JML.

1.

I.F. claims that LISD was deliberately indifferent to her alleged sexual assault because there was a "lengthy and unjustified delay" before it began its investigation.  I.F. rejects LISD's contention that it was not cleared to investigate the sexual assault allegation until mid-December 2012 and asserts that although CPD "finished its criminal investigation on November 8, 2012, . . . LISD did not begin its investigation for nearly two months," in January 2013. Aside from generally averring that LISD should have initiated the investigation soon after it received clearance from the police in early November 2012, I.F. proffers three reasons why LISD's delay was unjustified.

First, I.F. contends that the delayed investigation contravened the "Dear Colleague Letter," sent to LISD and all other school districts in the United States, by the U.S. Department of Education's Office for Civil Rights in 2011, which states that "a school . . . must promptly investigate" potential harassment and that "a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate the conduct."[12]  Second, she claims the delay was motivated by LISD's preference for its high school football program over the Title IX rights of its students.  Third, I.F. asserts that the district court mistakenly did not apply the reasoning of *Williams v. Board of Regents of the University System of Georgia*, 477 F.3d 1282 (11th Cir. 2007), which I.F. interprets as holding that a school may not delay its investigation in light of a pending criminal investigation where that investigation would not affect the school's ability to institute its own procedures.  Accepting I.F.'s version of when LISD received authorization from CPD to begin its investigation, each of I.F.'s claims nevertheless fails, and the evidence instead supports the conclusion that LISD was not deliberately indifferent to I.F.'s sexual assault allegation.

I.F. misconstrues the Dear Colleague Letter by selectively quoting it. Though she claims that the letter states that a school district may not delay its investigation in light of a simultaneous criminal investigation, the letter contains additional language regarding how a district should approach coordinating its Title IX investigation with a criminal investigation:

> Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed

---

[12] Dear Colleague Letter: Sexual Violence 4, Russlynn Ali, Assistant Sec'y for Civil Rights, Office for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

No. 17-40722

its gathering of evidence (not the ultimate outcome of the investigation or the filing of any charges), the school must promptly resume and complete its fact-finding for the Title IX investigation.[13]

LISD first learned of I.F.'s sexual assault allegation on October 15, 2012. The next day, Langston requested that LISD refrain from investigating the matter until CPD informed LISD that it could proceed because any LISD investigation could interfere with the criminal investigation. According to I.F., LISD received that authorization on November 8, 2012, and, thus, should have begun its investigation at that time. Therefore, because it was complying with the police request not to investigate for approximately three weeks between October 15 and November 8, LISD was not violating the letter during that time.

Furthermore, though LISD did not begin its investigation until January, accepting I.F.'s version of events, LISD's delay after the initial three-week period was not because it was waiting for police authorization. Consequently, I.F.'s attempt to use the Dear Colleague Letter's statements about coordination with criminal investigations—to demonstrate that LISD was deliberately indifferent during this period—fails. To the extent that I.F. contends that LISD violated the letter's mandate that school districts promptly resume their investigations after a criminal investigation has been completed, that is exactly the inquiry we are engaging in when we analyze whether LISD's delay in beginning its investigation was deliberately indifferent.[14]

Next, even accepting I.F.'s allegation of Denson-Whitehead's statements

---

[13] *Id.* at 10.

[14] The U.S. Department of Education's Office for Civil Rights has since rescinded the Dear Colleague Letter. Dear Colleague Letter, Candice Jackson, Acting Assistant Sec'y for Civil Rights, Office for Civil Rights, U.S. Dep't of Educ. (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

as true, I.F. has failed to raise a genuine dispute of material fact that Denson-Whitehead's statements evidence LISD's deliberate indifference because they were motivated by an animus against I.F. for attempting to "go against the football team." As the district court explained, at many high schools in Texas, the football team and its games are a source of school and community pride. Many students are involved in the team or related organizations, such as the cheerleading squad or the band. Consequently, an individual who raises serious sexual assault allegations against members of the team may experience resistance.

Denson-Whitehead's statement that "it was going to be very difficult going against the football team" must be construed in this context as expressing her concern to I.F. and her parents about this potential resistance. Denson-Whitehead's subsequent actions support this interpretation. She did not keep I.F.'s sexual assault allegation to herself or change details to make it seem less serious. Instead, the same day that she learned of the allegation, she informed Werneke and Langston, and the next day, she told Dalton. Though Denson-Whitehead's comment was inartful and could have been more tactful, it is not objective evidence of deliberate indifference.

Finally, I.F.'s reliance on *Williams*, an out-of-circuit case, is misplaced. The Eleventh Circuit found that the University of Georgia was deliberately indifferent because it waited eight months after receiving a full police report before conducting a disciplinary hearing regarding an alleged sexual assault. Though the university tried to justify the delay by averring to the pending criminal trials against the alleged assailants, the court rejected its contentions as insufficient. *Williams*, 477 F.3d at 1296–97.

I.F.'s case is readily distinguishable from *Williams*. LISD did not delay its investigation after receiving a full police report or because criminal trials

were pending. Instead, LISD delayed because of a specific directive from CPD. Accepting I.F.'s version of events as true, LISD then further delayed the investigation for about two months, which included Thanksgiving break and the Christmas/New Years holidays. This delay was much shorter than the eight-month delay that the *Williams* court relied on, in part, in finding that the university was deliberately indifferent.

Contrary to I.F.'s theory that LISD's delayed investigation shows deliberate indifference, the evidence supports the conclusion that LISD performed an extensive investigation within a reasonable time. Accepting I.F.'s version of events that LISD received authorization to begin investigating the sexual assault allegation on November 8, 2012, LISD's delay consisted of two periods: waiting for police authorization from October 16, 2012, to November 8, 2012, and the November 8, 2012, to January 7, 2013, period.[15]

Though a delay in instituting remedial actions may constitute deliberate indifference under Title IX,[16] LISD's twenty-eight school-day delay does not rise to that level. During that period, LISD was actively taking steps to provide relief to I.F. It worked together with I.F.'s teachers to get her the work she was missing during her absence and requested the teachers be flexible with I.F.'s workload, provided her with information regarding educational opportunities outside of LISD, and assisted I.F. in enrolling in the Homebound

---

[15] Based on a 2012-year calendar and the dates for the vacation periods LISD provides, Thanksgiving break and the Christmas/New Years holidays together consumed three full school weeks.

[16] *See, e.g.*, *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669–70 (2d Cir. 2012) (holding that a jury was within its power to find that a school district was deliberately indifferent where it waited over a year to implement remedial action in response to a complaint); *Matthews v. Nwankwo*, 36 F. Supp. 3d 718, 725 (N.D. Miss. 2014) (holding that an unjustified delay of two to three months in separating a complainant from the alleged assailant's class was deliberate indifference).

program.[17] In light of these known circumstances, the delay was not clearly unreasonable and thus was not deliberately indifferent. *See Davis*, 526 U.S. at 648; *Sanches*, 647 F.3d at 167–68.

Once it began its investigation, moreover, LISD's response was not deliberately indifferent. It interviewed fourteen students about the alleged sexual assault and followed up with four students, including the two alleged assailants. It interviewed I.F., with her lawyer present, and accepted her written statement. After reviewing the evidence, LISD concluded that it could not establish, with sufficient evidence, that I.F. had been sexually assaulted at the party, so there was no basis for any LISD discipline for sexual assault. Title IX did not require LISD to take specific disciplinary actions, comply with parents' remedial demands, or comply with its own regulations in investigating the complaint. *Davis*, 526 U.S. at 648; *Sanches*, 647 F.3d at 169. Instead of being clearly unreasonable, to the contrary, LISD's investigation was thorough and appropriate. Therefore, LISD's response to I.F.'s sexual assault allegation was not deliberately indifferent.

2.

I.F. contends that LISD was deliberately indifferent to her October 10, 2012, bullying complaints because it "never undertook an investigation into" them. Nevertheless, in light of the known circumstances, LISD's response to the harassment in the form of bullying was not deliberately indifferent.

When Fletcher contacted Denson-Whitehead on October 10 to report that I.F. was being bullied, she did not give specific details. Fletcher stated that I.F. was being "severely bullied" and opined that it could be cheerleading

---

[17] Furthermore, I.F. was separated from her alleged assailants by her absence from school and subsequent enrollment in the Homebound program.

bullying, but other than giving Denson-Whitehead the names of several students, who had bullied I.F. at her middle school, who Fletcher was unsure were involved, Fletcher "didn't have any names" for this bullying complaint. Denson-Whitehead said that she would speak with I.F. about the bullying when I.F. next attended school. But when I.F. returned to school on Friday, October 12, for the first time since Denson-Whitehead and Fletcher's conversation, before Denson-Whitehead could speak with I.F., Fletcher emailed Denson-Whitehead to request that she not speak with I.F., and Denson-Whitehead complied.

The following Monday, October 15, LISD learned of I.F.'s alleged sexual assault and shifted its focus to investigating that claim. After that date, I.F. never provided a statement to LISD regarding the bullying, nor did the Fletchers give LISD further details to supplement their earlier complaint about the bullying. Therefore, in light of the known circumstances, LISD's response to the bullying complaint was not clearly unreasonable and thus was not deliberately indifferent.

### 3.

I.F. does not specifically allege that LISD was deliberately indifferent to her complaints of cyberbullying through Twitter and Instagram. Because, however, I.F. asserts that the cyberbullying was sexual harassment under Title IX, if there is a genuine dispute regarding whether LISD was deliberately indifferent to these complaints, summary judgment was inappropriate. Nevertheless, LISD was not deliberately indifferent to the cyberbullying complaints.

In response to I.F.'s first cyberbullying complaint on January 7, 2013, LISD promptly interviewed nineteen students in early-to-mid January and reviewed the alleged offending social media posts. Though LISD concluded that the posts did not constitute "bullying" as defined by LISD policy, it still

considered them improper and hurtful. LISD therefore counseled the implicated students about inappropriate social media behavior, advised them not to engage in such behavior in the future, and contacted their parents.

In response to I.F.'s second cyberbullying complaint on February 19, 2013, LISD promptly reported the matter to CPD, which began an investigation. As a result, one Hebron student was charged with criminal harassment, and LISD suspended him for three days and assigned him to the Disciplinary Alternative Education Program for thirty days as punishment.

LISD's responses to both cyberbullying complaints were reasonable investigatory efforts aimed at discovering who was responsible, determining whether Title IX sexual harassment had occurred, and remedying offending conduct. Consequently, LISD's investigation was not clearly unreasonable, and it was not deliberately indifferent.

There is no error. The summary judgment is AFFIRMED.